## GIBSON v. UTAH LIGHT & TRACTION CO.

No. 2750. Decided August 4, 1915 (151 Pac. 76).

1. STREET RAILROADS—PERSONAL INJURY—QUESTIONS FOR JURY—NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE. On evidence in an action for personal injury from a collision with defendant's street car while crossing the tracks at a street intersection, alleging negligence in running the car at an excessive speed, and in failing to give warning signals, *held*, that the questions of plaintiff's contributory negligence and defendant's negligence as the proximate cause of the injury were for the jury.[1] (Page 573.)

2. STREET RAILROADS—PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE. The same degree of care is not imposed upon a pedestrian attempting to cross an ordinary street car track that is imposed on him in attempting to cross a steam railroad track. (Page 573.)

3. STREET RAILROADS—OPERATION—CARE REQUIRED. While a street railroad has a preferential right of passage along and over its car tracks to which all others must yield, yet the street car operatives and a traveler must reciprocally exercise ordinary care to avoid injury.[2] (Page 573.)

[1]*Wilkinson* v. *Railroad*, 35 Utah 110; 99 Pac. 466; *Pratt* v. *Light & Ry. Co.*, 38 Utah 500; 113 Pac. 1032; *Oswald* v. *Light & Ry. Co.*, 39 Utah 245; 117 Pac. 46.

[2]*Spiking* v. *Railway & P. Co.*, 33 Utah, 313; 93 Pac. 838.

4. STREET RAILROADS—CONTRIBUTORY NEGLIGENCE—STOPPING AND LISTENING. A traveler is not required either to stop and listen or to specially look for an approaching street car, though bound to exercise ordinary care for his own safety in crossing a street car track. (Page 574.)

5. STREET RAILROADS—PERSONAL INJURY—NEGLIGENCE—LAST CLEAR CHANCE. Where plaintiff crossing defendant's street car track did not exercise the required degree of care, defendant had no right to run him down, if by ordinary care it could have avoided doing so after discovering his inattention or peril. (Page 574.)

6. NEGLIGENCE—PROXIMATE CAUSE. The negligence of either party is operative only when it constitutes the proximate cause of the injury or damage complained of, and if it is merely the remote cause the law regards it as inoperative and inconsequential. (Page 575.)

Appeal from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by Samuel Gibson against the Utah Light & Traction Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*P. L. Williams, George H. Smith, J. V. Lyle,* and *Paul Williams,* for appellant.

*Thomas Marioneaux* and *Willard Hanson,* for respondent.

FRICK, J.

The plaintiff brought this action to recover damages for personal injuries which he alleged he suffered through the negligence of the defendant. The plaintiff, after stating that the defendant owned and operated an electric street car system in Salt Lake City, in substance alleged that on the 3d day of March, 1914, while "in the exercise of due care," he was crossing the intersection of certain streets in Salt Lake City, the defendant carelessly and negligently operated a street car

at an unlawful and excessive rate of speed, to wit, in excess
of twenty miles an hour, and also carelessly and negligently
failed to give any warning signals in approaching the street
intersection aforesaid, and carelessly and negligently ran said
car so that it struck the plaintiff with great violence while
he was in the act of crossing the defendant's street car tracks
on said intersection, and that by reason of being struck as
aforesaid he sustained serious and permanent injuries about
his body.    The plaintiff also pleaded the city ordinances in
which the speed limit for street cars was fixed at twelve miles
an hour, and in which it was also provided that all street cars
must be equipped with gong bells or whistles, which must be
rung or sounded as provided in said ordinances in approach-
ing street crossings.    The defendant answered the complaint
denying all acts of negligence and pleaded contributory negli-
gence on the part of the plaintiff.    When the plaintiff had
rested his case, the defendant moved for a nonsuit.    The mo-
tion was denied by the court, and defendant excepted.    The
case was submitted to the jury upon all the evidence, and
they returned a verdict for the plaintiff, upon which judg-
ment was duly entered.    The defendant appeals from that
judgment.

In appellant's brief counsel state the proposition submitted
for decision thus:

"The action of the trial court in overruling the defendant's
motion for a nonsuit is the sole ground upon which this de-
fendant relies for a reversal in this case."

This requires us to state plaintiff's evidence somewhat at
length.    So far as possible, we shall follow appellant's printed
abstract of the evidence.    We do this because, after exam-
ining the original bill of exceptions, we find that appellant's
counsel have fully and fairly abstracted the evidence upon
which they rely for a reversal.

According to the printed abstract, plaintiff, in respect to
the accident, testified in chief as follows:

"My name is Samuel Gibson. I am seventy-seven years old.
My birthday is on June 18th. I was seventy-seven in June.    I
have lived in the city here for nine years now. I was in the city
last March when this accident occurred. It occurred on the 3d

day of March. It was in the evening, just about dark. I was go-
ing out to Mr. Powell's. He is an old friend of mine, and we
were together. When I reached the corner of First West
street, I went across the street to get some tobacco and did
not like the tobacco, and came out of that and came across
the street over to the hotel there, and he went in and got
some tobacco and then went on down the street, put tobacco
in our pipes, and stopped to light our pipes, and we were
going across the street next block. That was crossing First
West street, First West street and First South street. He
(Mr. Powell) went a little bit ahead of me, and I
started on to walk fast to get up with him on the
other side, and he got ahead of me, and I went across
the first line of tracks, and just stepped right about the middle
of the other track, and that bell rang right behind me, right
alongside of me. I did not have time to look one way or the
other. I did not know how to get out of that; but I was
quickly put out. I was quickly knocked out. I stopped right
in the track. I never heard a thing until I heard the crash
of that bell. The bell that I heard was the sound of the
bell on the street car. It was on the car because the car
was making the noise. It sounded like a bell ringing. When
I heard that, I stood right about the middle of the track that
the car was on. The car was going down the street. That
would be going west, and when I saw it I tried to get either
one way or the other and broke me up so I lost half my senses,
I guess, until it hit me. Then it put me off. The car hit me.
It knocked me unconscious. I lost my senses. It hit me some-
wheres right on the back of the head, and in my ribs here, and
in my back and in here."

On cross-examination he said:

"I have been in Salt Lake about nine years. This injury
happened on First South street, down on First South street
and First West, and that is a distance of about three blocks
from Main street. I know where Main street is. It is two
blocks. And Main street is the principal business street in
the city, and the place where I was injured was about two
blocks from that street. * * * The day of the accident,
I went across one track and went to cross the other, just

happened to stop. Stopped right in the middle of that track, and this come right onto me, and I just heard the crash of the bell. That was the first thing I knew of the approach of the car. I didn't have time to look to see whether it was coming before that. While I was walking across the street there, I didn't look up First South to see whether a car was coming. I never thought of it, never thought of it until I heard the bell. The first thing I knew of the approach of the car was when I was standing in the middle of the north track and heard the bell ring. It was right on me then. Before stepping on the north track, I hadn't looked up to see if a car was coming, because I thought I was clear. The thought of a car did not enter my mind before that time. It entered very quick after. I was just a little hard of hearing in one ear at the time of the accident, not a great deal."

On re-direct he testified as follows:

"I didn't hear the bell when I stopped, but just went to move, and I heard the bell. Then just turned around like that, and the car was right on me. I didn't stop on the track no time hardly at all, come that quick, come right onto me. I just stopped there to see Mr. Powell, went down to that corner, or went up this sidewalk here. Just stopped to get my directions; that is just what I happened to stop. Just as quick as you could think. I heard that bell, but I could not get that way or get this way until it hit me. I started to go across this way to the coner. I saw Mr. Powell over there and started to go that way, and the bell come in that quick on me, and the car."

Mr. Walls, on direct examination, testified as follows:

"I remember that an accident occurred on the street car. I could not tell you what day it was; it was a long while since. I remember a man that got hurt with the car. This is the gentleman, Mr. Gibson, the plaintiff in the case. I could not tell you the time either. It was light. The sun hadn't gone down. It was in the afternoon. I stood at the gate, and I saw that man same as he was paralyzed in my estimation, did not know whether to go across the track or stay back, and at last he made a motion to go across, and the car struck him. When I first saw the plaintiff, Mr. Gibson, he was going away

from the Fourteenth Ward Chapel and going on that side of the road from the Fourteenth Ward Chapel, going across. * * * He was crossing the street. I saw him crossing the street until he got—there was a pole somewhere about here, and he just got to the pole. No, he hadn't got past the pole; he got up to the pole when the car hit him. He was on the street car track then, and the car hit him, of course. I didn't see him until he came to the corner; from that time I saw him. He was walking across the street. He was walking somewhere on the diagonal from one street to the other in that direction. He got on the far track when the car hit him, that would be the north track, and he kept going right along. When he got to the street car track, he seemed to stop back a little bit, and then made a bit of a push. That is when he got on the street car track. The car was almost on him at that time. I heard a bell; I never heard the bell ring until, in my estimation, it must have struck him. I never heard the bell ring until it struck him. You see I live here, and here is the car. I never heard the bell ring before it got past this place here. I never heard it ring until it got past my line of vision, and then it would be practically upon him. I didn't hear any gong sound. I wouldn't say the gong didn't sound; I heard the bell. I heard a sound; I know it was something sounding. That noise was made when he was on the track and did not know whether to go across or back backwards. That was practically at the same time the car hit him and knocked him on the right-hand side of the road. That is all I saw of it. I saw the car as it came just before it hit him and just as it hit him and as it passed him.''

On cross-examination he testified as follows:

''I noticed the car running across the billboard. and I saw the car coming down. The billboards are on the corner, and all the view I got of the car was from the time it passed the billboards until it got to the middle of the road. With that view of it I am able to judge the speed it was going. I judge it was going fourteen or fifteen miles an hour. Might have been more; might have been less.''

Mr. Powell, a witness for the plaintiff, testified on direct examination as follows:

"My name is James Powell.  *  *  *  I am acquainted with Mr. Gibson. I have known him quite a while, a number of years. I was present at the accident to Mr. Gibson.  *  *  * We went to the corner, and we got pretty near to this side of the corner. The corner is vacant, house stands back, and there is a tailor shop there, and Mr. Gibson says, 'I am going to light my pipe.' I walked down and kind of catacorned across, and I heard the bells and looked around— Zip! There was the old man throwed around dead. I said he was. I got back there as quick as I could, and there was people all come out. I do not know what time of day the accident occurred. I didn't see no time or anything; perhaps six o'clock or somewheres. It was in the evening.  *  *  *  I got near the opposite corner. Then I heard the noise, looked around, and there was the poor old man. The noise was the bell as hard as they could ring on the street car. The old man was up in the air just when I looked around, and down he went. I had not heard the bell ring before that. I hadn't heard anything. He was just going to light his pipe and follow me across, and little did I think. I turned around and looked when I heard the bell. At that time he had been struck, was being thrown by the street car. I never noticed the gong only right at the time I heard it and looked around and seen the man dead. At that time it was going west. After the car hit him, it stopped, after it got about a third of a block down. I looked for the number, and it was out of my reach. Then I went back to the poor old man to see how he was. The car looked like it went about a third of a block to me; that is, of the next block. It went past the corner down the block."

On cross-examination he testified:

"After I went ahead of him, I walked down across the street; that is, zigzag across. Then it was I heard the sound of the gong, and I looked around and he was up and back. He had not stopped in the middle of the street car track to light his pipe. He had stopped up at the front of this, stopped at the brick, at the sidewalk. So I don't know whether he stopped on the middle of the track or not. I walked down and heard the bell and looked around; he was up in the air.

I say I heard it then, and looked around and seen him up in the air. That is all the bell I heard. Then I went directly back to him as quickly as I could. I looked to catch the number of the car, but I was after him more.''

Mr. Jewett, another witness called on behalf of the plaintiff, on direct examination testified as follows:

''My name is A. K. Jewett. I reside in Salt Lake City. I am a conductor on the Denver & Rio Grande running out of Salt Lake. I have been railroading about twelve years in different branches, in the operating service; that is, either as conductor, brakeman, or similar work. I was in Salt Lake the day of the accident to Mr. Gibson. I saw the accident. I was going from my boarding house about two doors north of this corner where the accident happened, and as I turned the corner I observed the street car coming at a fast rate of speed, and what attracted my attention first was the wheels sliding on the car. I being working on the railroad and familiar with the sliding of the wheel, that will attract our attention quicker than anything else. It was about two car lengths distant. Mr. Gibson started across the track, and I observed it was about a car length from him when I heard the whistle and bell ring at the same time. He struck the old gentleman; knocked him, I should judge, about forty feet. When the car got stopped, it was about three or four car lengths by where they first struck the old gentleman. I think the bell started to ring or the gong sounded or the whistle blew about a car length from Mr. Gibson. I was looking at it and watching it. I do not know whether it rang before that or not. I didn't hear it. If it had rung, I think I would have heard it. I didn't hear it. I was looking at it in a position where I could hear if it did ring. When I say that the bell rang, or the gong sounded, that is the same thing. None of these noises were made until this time, so far as I heard. When I say a car length, I mean about the length of the street car, twenty-eight or thirty feet. When I say it was going fast, I mean from the rate of speed it was going, it was going about — I am a train conductor and have been a brakeman for about eight years. All that time on railroad trains, and I had occasion to observe the speed of trains a

good deal, and note them. I have been off them and on them and observed the time they were going. Not only trains, but other vehicles. I am able from my experience to judge the cars and trains that move by me, the speed they are approximately making. From my experience I would say the speed of the car at the time it struck Mr. Gibson was from twenty-five to thirty miles an hour. Immediately upon the car striking him, I ran to the old man. It knocked him towards me, about ten or twelve feet from me. I started to raise him up. It looked to me as though he was dead. He kind of gasped when I started to pick him up, laid him down, and ran to the telephone at the boarding house where I had just come from, couple of doors away, and telephoned for the police ambulance. * * * When I first saw Mr. Gibson, it was just before he started to cross the track. He was walking straight ahead, walking all the time. At the time the car struck him, he was still walking, and I thought the step caught him on the north side of the car. I think he was pretty near over the track. It was going so fast I could not tell. Could not tell what part of the car struck him. The neighborhood where this accident occurred, First West and that immediate vicinity, is a thickly settled part of the city. There is a hotel and business house across the street, mostly residences around there close. There was a terrace there, I forget what they call it, on First West. There are poles in the center of the crossing there.''

On cross-examination he further testified as follows:

''I think it was about 6:15 when this accident happened, around about that. Around about six, anyhow. I had just come from my boarding house. I was on the west side of First West street, on the side towards the depot. I was going to the Colonial Hotel at that time. That is on the north side of First South street, about a block or a half a block from there. I was not with anybody at that time. The wheels sliding on the car was what first attracted my attention to Mr. Gibson. Before that I had not been paying particular attention to the approaching car, or anything about it. When I heard the wheels sliding and looked up, I think the car was about the length of the car east of the crossing. That is where the side-

walk crossing would be. Then it was east of the east crosswalk when the wheels started to slide. Before that time I had not heard the bell ring, and had not paid any attention. So I am not in a position to say whether it did or not. I am not in a position to say whether the whistle blew or not before that time. I saw Mr. Gibson walking directly over in front of the car before the car got to him; that is, he was crossing the street from the southeast to the northwest. He was walking across the street, but he would have plenty of time to get over if the car had been running at an ordinary rate of speed. But he walked across the street. He walked right on the track, and when he got about the north rail he was struck by the car. I didn't see him stop at all. He kept right on walking. There was no other car around there at that time. There were no automobiles or carriages that I saw. I do not think that there was anything else to distract his attention except the car coming from the east at that time. * * * The distance in which a car can be stopped depends on the rate of speed they are going, how heavily they are loaded. Supposing the car was going down the grade there at the rate of twelve miles an hour, it would stop in ten feet or less; stop in eight feet. You can stop a car going twelve miles an hour in a distance of eight feet. Just a slight downgrade there, a water grade. * * * I base my opinion that a car can be stopped in about ten feet, going twelve miles an hour, on the practical experience I have had on the railroad, The difference is this: A railroad man or anybody knows these street cars have what is called the straight air. That is much quicker than the automatic air. On a steam road the air works automatically. You take it out to set the brake. The street cars will take hold quicker than the automatic will. I never operated a street car. * * * The car went three or four car lengths after it struck Mr. Gibson. When the car stopped, it was by the crossing, I should judge; that is, the west crosswalk. Probably twice its length by the crossing. It was by the crossing quite a bit. I did not take particular attention to notice right exactly where it stood. Mr. Gibson was about three car lengths from the back platform when the car had stopped. From the position in which he was lying

there it would be about three car lengths to the back plat-
form of the car that struck him. When the bell first started
ringing, I was about a car length away. He was walking with
his back rather towards the car. He was walking. He would
hardly have time to get off the track after that bell. *   *   *
I couldn't say whether he had looked to see whether it was
coming. I hadn't paid any attention. I didn't see him look.
He was in the act of stepping over the track as I observed
the wheels sliding on the car. I looked to see what the trouble
was and noticed him step on the track going across the track
on the other side, and the car was about two car lengths away
from him at that time. He was just starting over the south
rail at that time. At the time he was starting over the south
rail, the car was about two car lengths away; that is, the
south rail of the north track. *   *   *   From the place where
he was struck to the rear platform was about three car lengths.
Then when I testified before that from the position in which
he was lying to the rear platform was three car lengths, I
meant the car was about three car lengths from where it
struck him. I don't believe I understood your question be-
fore. If I testified that way I did not. I know where the
pole is with reference to that intersection there. He was about
half way between the east crossing and that pole that stands
in the center when the car struck him. So that he would be
about half way between the center of the street and the east
crossing. He was between the east crossing and the center
of the street. At the time he went upon the south rail there,
the car was about three car lengths away from him. It was
then the wheels were slipping. That being so, the wheels
were locked; the air going into emergency. That would be
the motorman's last move, would be to throw the car into
emergency. The next thing would be to get off. All that he
could do after that was to get off.''

We have given the testimony of the last witness practically
in full, since he was in a position to observe the accident and
apparently possessed the requisite knowledge and experience
to state his observations intelligently and clearly. Besides,
in view of his experience, his testimony respecting speed and
movement of the car could have been regarded by the jury

as reliable. There is considerable more testimony; but it really is a mere restatement in different form of the circumstances already stated, with the exception of the nature of the injuries and the physical condition of the plaintiff, neither of which is material here.

It is contended that, in view of the foregoing evidence, plaintiff was guilty of negligence as matter of law, and hence the court erred in denying the motion for a nonsuit. The writer desires to state that at first blush he was impressed that, under plaintiff's own admissions, he did not give the matter of the approaching street car any thought or attention, that he was guilty of negligence which **1, 2, 3** directly contributed to the accident, and hence he could not recover. Upon more mature reflection, however, I was compelled to modify my first impressions. As I now view the matter, plaintiff's conduct, even though it were conceded to have been negligent—nevertheless the jury were authorized to find that it did not constitute the proximate cause of the accident. True it is that, if the plaintiff had timely stopped and looked, or had stopped and listened before going on the track, he would, in all probability, have discovered the approaching car, and would thus have permitted it to pass him, and hence would have avoided the collision. If the plaintiff, under the same circumstances, and in view of his admissions, had gone onto a steam railroad track in front of an approaching train or engine, it might well be held, as we held in *Wilkinson* v. *Railroad*, 35 Utah, 110, 99 Pac. 466, that he was guilty of negligence preventing a recovery as a matter of law. Again, if the plaintiff had gone onto a street car track in front of an approaching car at night at a place where it was dark so that he could not have been seen approaching the car track by the operator of the car, and when he could easily have seen the approaching car, and where people did not habitually cross the track, as was the case in *Pratt* v. *Light & Ry. Co.*, 38 Utah, 500, 113 Pac. 1032, or if he had done so under the circumstances that prevailed in *Oswald* v. *Light & Ry. Co.*, 39 Utah, 245, 117 Pac. 46, it might well be held, as it was held in those cases, that a nonsuit or a directed verdict would have been proper. We have, however, often

held that the same degree of care is not imposed upon a pedestrian attempting to cross an ordinary street car track that is imposed on him in attempting to cross a steam railroad track. The reason of the rule is so palpable that it requires no discussion. We have also often defined the reciprocal duties imposed upon both the street car company and the ordinary traveler so far as those duties can in terms be defined. In that regard we have held that, while the street car company possesses a preferential right of passage along and over its street car tracks to which right all others must yield, yet that the duty of exercising ordinary care by both the company and the traveler who may be using the street is reciprocal; that is, both the traveler and the street car operatives must exercise ordinary care as more particularly defined and stated in *Spiking* v. *Railway & P. Co.*, 33 Utah, 337, 93 Pac. 838, and in other cases decided since then. In view of those decisions, under the circumstances of this case, what was the duty that was imposed both the plaintiff and the operators of the street car in question? It is manifest, as already state, that by either stopping and listening, or by stopping and looking for 'the approaching car, the plaintiff could have discovered its approach, and could thus have avoided the collision.

A traveler, under the law, however, is not required either to stop and listen, nor yet to specially look for an approaching car. He is bound to exercise ordinary care for his own safety in passing over a street car track, and whether he has complied with that duty under the peculiar circumstances as they are developed in each case is, ordinarily, a question of fact and not of law.

But let us assume that the plaintiff in this case did not exercise that degree of care that he should have exercised, yet the defendant had no right, for that reason, to run him down, if, by the exercise of ordinary care, it could have avoided doing so after discovering either his listlessness or his peril. The evidence is such that the jury could have found that the motorman conducting the car in question could have seen, and therefore they had a right to infer that he did see, the plaintiff passing from the south side of the street towards the street car tracks. Moreover, the evi-

dence shows that the motorman must have observed that the plaintiff, whether he were old or young, seemed mentally engrossed, and was thus not fully exercising all of his faculties. Notwithstanding that, as the evidence shows, the motorman continued to drive his car at more than double the rate of speed authorized by the ordinance, not only on the main portion of the street, but near the street crossing. Now, the very purpose of fixing a speed limit is to place the movement of cars under the full control of the motorman at all times. Under the evidence, the jury, in passing upon the effect of Mr. Jewett's testimony, who was an experienced railroad man, could well have found that if the motorman had obeyed the ordinance he could easily have stopped the car after he discovered that the plaintiff was not conscious of its approach, and thus could have avoided the collision. The jury thus would have been justified in finding that the motorman's negligence was the proximate cause of the collision and consequent injuries to the plaintiff.

It is elementary that the negligence of either party, in the eye of the law, is operative only when it constitutes the proximate cause of the injury or damage complained of. If it is merely the remote cause, the law regards it as inoperative and of no consequence. Suppose it be conceded, therefore, that the plaintiff was negligent in crossing the street in the manner he did, yet the jury would have been authorized to find, under the evidence as it stood at the time the motion for nonsuit was made, that his negligence, under all the circumstances, was not the proximate cause of the injury. If it be once held that under such circumstances conduct like that of the plaintiff prevents a recovery as a matter of law, then the street car company may with impunity run down every pedestrian, be he young or old, physically sound or unsound, if he does not avoid a collision by stopping, looking, and listening for an approaching car. Had the operator run his car within the speed limit, and the plaintiff had stepped in front of the approaching car and so near to it that the operator could not have avoided striking him, the case would be entirely different. That is, in effect, the Pratt case. This case, however, for the reasons stated, is controlled by

circumstances which are entirely different. Here the jury, under the facts and circumstances,. could well have found, under plaintiff's evidence—and they must have so found under all the evidence—that the accident was entirely due to the defendant's negligence. Under such circumstances, courts may not dispose of a case as a matter of law.

For the reasons stated, therefore, the judgment ought to be, and it accordingly is, affirmed, with costs.

STRAUP, C. J., and McCARTY, J., concur.