## MILLER v. UTAH LIGHT & TRACTION CO.

No. 6023. Decided January 3, 1939. (86 P. 2d 37.)

370

*Gaylen S. Young,* of Salt Lake City, for appellant.

*Bagley, Judd, Ray & Nebeker,* of Salt Lake City, for respondent.

LARSON, Justice.

Plaintiff brought this action in the District Court of Salt Lake County, to recover a judgment for damages for personal injuries. At the close of the evidence the court directed verdict for defendant. Plaintiff assigns error. The

action grows out of the following facts: Defendant maintains and operates a street railway system in Salt Lake City. It operates electric street cars, lories propelled by electric current from the wires but running on rubber tires instead of tracks, and gasoline motor buses. Extending north and south along Main Street are double street car tracks. East and west on Second South Street and intersecting Main Street are double tracks. Rounding each corner of the intersection on "three center curves" are tracks permitting street cars to turn from Main Street into Second South Street, or vice versa. Across Main Street in line with the sidewalks are pedestrian lanes twenty feet wide, marked by yellow lines painted across the street. Abutting and east of the tracks on Main Street, and just south of the pedestrian lane on the south side of Second South Street, is a safety zone for the protection of people getting on, off, or waiting for street cars. This safety zone is set off by a row of iron posts set in the pavement, 7 feet 2 inches from the east rail and extending south from the pedestrian lane about 7 feet. At the intersection was a traffic light semaphore and also a police officer directing traffic on the afternoon of the accident.

Plaintiff was walking west across Main Street in the pedestrian lane on the south side of Second South Street. As she reached a point in the pedestrian lane north of the safety zone, the traffic lights changed for the east and west traffic to stop and the north and south traffic to go. At the whistle indicating a change in the lights, plaintiff stopped, looked at the traffic lights, and then looked (southward) down the tracks, decided she was in a safe place and waited for the lights to change again so she could continue her journey. On the east Main Street track immediately south of the pedestrian lane, and along the safety zone above mentioned, stood defendant's motor bus awaiting the signal to start and take the turn east into Second South Street. After the lights changed the traffic officer standing at the center of the intersection blew his whistle, hand signaled the northbound traffic on Main Street to stop, moved over towards

the southeast corner of the intersection, and signaled the motor bus to move on its course turning eastward into Second South Street. The operator moved the bus forward, following the tracks around the curve. The side of the bus on the overhang around the curve struck plaintiff, causing her to fall to the ground. She was picked up at a point north of the pedestrian lane and the rear wheel had run over her leg. She sustained a badly crushed leg, fractured ribs and other bruises.

She brings this action for damages alleging the following acts or grounds of negligence on the part of defendant: (1) Failing to yield the right-of-way to plaintiff; (2) Failing to sound a horn; (3) Failing to give plaintiff warning in any manner whatsoever; (4) Failing to keep a proper lookout; (5) Turning the bus suddenly and abruptly without warning so as to strike the plaintiff. We shall assume that each of these grounds is sufficiently pleaded to make an issue as a ground or basis for liability and consider in order whether they are sustained by the evidence and the law.

(1) Is there evidence to take the case to the jury on the ground that defendant failed to yield to plaintiff the right-of-way? Plaintiff's own testimony, as that of all other witnesses at the scene of the accident who testified, was to the effect that there was a traffic regulating semaphore at the intersection and that plaintiff, a part of the west bound traffic, heard the whistle and saw the signal lights change for east and west bound traffic to stop and "north and south bound traffic to go"; that pursuant thereto she stopped near the safety zone, and not in front of the bus, to let the north and south bound traffic go, waiting for the lights to change again and give her the right-of-way. It is also admitted that a traffic officer was at the intersection directing the movement of traffic and that the bus moved only upon and under his direction. As to whether the plaintiff, having started across the street while the lights were in her favor, could had she chosen so

to do have continued onto the other side of the street, we need not determine. She did not do so. She does not contend that she did so or that she intended to do so. She states that she stopped and yielded the right-of-way *"knowing that the traffic would go";* that she looked around, decided she was in a place of safety and waited for the lights to change again. According to all the evidence she was standing still, not needing, not demanding, not using and not claiming the right-of-way, and defendant was therefore under no liability to yield that which no one else wanted, demanded or needed. *Guillory* v. *United Gas Pub. Service Co.,* La. App., 148 So. 274; Laws of Utah 1935, Chap. 48; 57-7-9 and 57-7-2, R. S. Utah 1933. There is no evidence at all of any negligence on this ground.

(2) Did plaintiff show any negligence in defendant's failure to sound a horn? It may be granted that the operator of the bus did not sound a horn or bell as it proceeded from its stopping point at the safety zone around the curve track into Second South Street. Sec. 57-7-29, Chap. 48, Laws of Utah 1935, as far as material here reads:

"No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety *and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement* or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement. * * *"

The law is well settled that the purpose of warning signals by trains or motor vehicles is to give notice of their presence or approach so another person will not be taken by surprise or caught napping. But where the other party has actual knowledge of the approach, presence, or movement of the train or vehicle, a warning signal is not necessary to impart that knowledge to him, and therefore the failure to give such warning does not ipso facto establish negligence because there is then lacking a causal connection between the failure and the accident.

In *Ryan* v. *Trenkle,* 203 Iowa 443, 212 N. W. 888, 890, the court said:

"A person who has knowledge of the presence of a train or auto which imparts to him the very thing that a signal was intended to impart cannot, under ordinary circumstances, predicate negligence on the failure to give a signal."

To the same effect are *Haarstrich* v. *Oregon Short Line R. Co.,* 70 Utah 552, 262 P. 100; *Schmidt* v. *Chicago & N. W. R. Co.,* 191 Wis. 184, 210 N. W. 370; *McGlauflin* v. *Boston & M. R. R. Co.,* 230 Mass. 431, 119 N. E. 955, L. R. A. 1918E, 790; *Nadasky* v. *Pub. Service R. Co.,* 97 N. J. L. 400, 117 A. 478.

Plaintiff testified that she stopped at the traffic lights' change; that she saw the bus standing by the safety zone ready to go; that she knew it would move forward with the change in lights and therefore she stopped so the traffic (including the bus) could move forward. When she knew it was there, knew it was going to move forward when it did, and stopped waiting for it to pass, she cannot well assert that she was taken unawares and the failure to sound the horn was the proximate cause of the injury. It may be argued that she assumed the bus would go straight north whereas its course would take it around the corner. It was a traction company bus, rails went around the corner as well as straight ahead, and there was no more cause for thinking it would go north than that it might turn east, especially since before the bus moved the traffic policeman after letting part of the traffic go north, right before her eyes, blew his whistle, stopped the automobile traffic and signalled the bus to make the turn around the corner.

In addition to the statute quoted above, Chap. 48, Laws of Utah 1935, 57-7-10, provides:

"The driver of a vehicle or operator of a street or interurban car or electric trolley coach intending to turn to the right or left at an intersection where traffic is controlled by traffic control signals or by a police officer shall proceed to make either turn with proper care

to avoid accident, and only upon the 'Go' signal, except as otherwise provided in this section or unless otherwise directed by a police officer or by official traffic signs or special signals."

And R. S. Utah 1933, 57-7-2 and 57-7-9 read:

Section 57-7-2. "It is unlawful for any person to refuse or fail to comply with any lawful order, signal or direction of any traffic or police officer invested by law with authority to direct, control or regulate traffic."

Section 57-7-9. "It is unlawful for the driver of any vehicle or for the operator of any street or interurban car or electric trolley coach to disobey the instructions of any official traffic sign or signal placed in accordance with the provisions of law, unless otherwise directed by a police officer."

It is therefore evident that there was no showing that the failure of the operator of the bus to sound a horn had any legal causal connection with or was or could be the proximate cause of the injuries to plaintiff, and the directed verdict on this score was proper. *Southern R. Co.* v. *Walters*, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239.

(3) What we have said in discussing point Number 2 above disposes also of point Number 3, regarding failure to give any warning or signal.

(4) Did the plaintiff show any failure on the part of defendant to keep a proper lookout, or any causal connection between such failure if any and the accident? In considering this question we may ask: What constitutes a failure to keep a proper lookout, and wherein if at all did defendant fail? We shall not attempt a specific definition of "proper lookout"—the term perhaps defines itself as well as any other language can do. It imposes upon the driver the duty of being watchful and reasonably alert so as to see and observe any person, vehicle or other substantial object upon the road he is travelling sufficiently far in advance of his car to enable him to avoid striking such person or object; and to be on the alert and watchful for such persons or objects as he may reasonably expect to be upon the street or in such proximity thereto as to be

in a position of, or exposed to danger from the movement of his vehicle. It means he must be aware of such things as in the exercise of ordinary care he should have known; he must be watchful for dangers which may reasonably be anticipated, keeping his visual consciousness awake as to things in front of him and coming into his path from the sides, or likely to come in from the sides, back substantially as far as he can see without turning his head so far as to take the part immediately in front of him out from his field of vision.

To require the driver or operator to be watching for persons or objects which might come into the danger zone after the driver has passed, that is, to require him to be watching out behind while he is going forward, would be impracticable and contrary to law and would increase ■ the dangers and collisions and accidents ahead. When a vehicle has reached a given point, eliminating the question as to right-of-way, the duty is upon the other party to avoid running into such vehicle. He must be on the alert and keep a proper lookout. Cases have been cited where negligence was found when the operator backed his car into another person. *Coke* v. *Timby,* 57 Utah 53, 192 P. 624. Such cases do not affect what has here been said. When a driver backs his car the rear end is in effect the front or forward end in the movement, and the driver must keep a lookout ahead in the direction he is moving. Is there any evidence here that defendant failed to keep a proper lookout? Plaintiff testified that she stood at a point off the tracks and so far away that she though she was in a safe place. Her witnesses, Gates and Everett, saw her where she was standing and did not think she was in any situation of danger. There was no testimony from any one else who saw her at all standing in the cross walk before she was struck. She was not in front of nor in the path of the bus. The operator looked ahead over his course and saw no one in any place of apparent danger. The people in the northbound automobiles stopped by the traffic officer for the bus to make the turn saw no

one in any place of apparent danger, nor did the traffic policeman who stood to the east and right to the curve the bus was to follow, directing the movement of the bus. There is therefore no evidence at all that plaintiff was in any position where a lookout would or should have revealed her as being in a position of apparent danger, and therefore no evidence from which it could be inferred that the operator failed to keep a proper lookout.

(5) Did the bus turn abruptly and suddenly so as to strike the plaintiff? Every witness but one who testified as to the position of the bus stated that as it moved from its position near the safety zone around the curve "it followed the rails," that is, it was "astraddle of the rails," "as near centered as could be," and that "the right front wheel was not more than a few inches" over the rail. One witness said it "seemed to turn abruptly after it crossed the pedestrian zone" but he could not tell where it was. The rails make a "three point curve" around the corner from the center of Main Street south of the intersection to the center of Second South Street east of the intersection. This curve the bus was following moving under the directions of the traffic officer. The turn to the right therefore was not a sudden or abrupt turn but an established arc for the buses and street cars, as sweeping, gradual, and wide as could be made around the corner. The speed was from zero at starting to about 3 to 4 miles per hour at the point of the accident, so there was no sudden or abrupt change in the movement or speed which caused or contributed to the accident.

Let us now examine the authorities and see what is the duty of the operator of a street car or bus, and also of the other persons using the highway, to protect such other parties from collision with the overhang of the street car or bus as it rounds a curve. The cases cited by appellant on the question are not in point. They are cases dealing with rights-of-way and collisions at crossings and on highways where the injured party was upon the highway in front of the approaching car. The law seems to be well

settled that the operator of a street car or motor bus when rounding a curve and moving in accordance with traffic laws and regulations, and in broad daylight, is justified in assuming that an adult person knowing that a bus is in the street and taking a position in the street far enough away to permit the front end of the vehicle to clear and pass him, will if necessary move back far enough to avoid being hit by the inward swing of the overhang at the middle or the outward swing of the rear end.

In 25 Ruling Case Law, p. 1245, under title "Street Railways," the law applicable to this class of cases is thus stated:

"Rounding Curves: It seems that a street railway company is bound to use only a reasonable amount of care to keep pedestrians from being struck and injured by its cars at curves. The rule approved by the weight of authority is that in view of the well known fact that in rounding a curve the rear end of a street car will swing beyond the track and overlap the street to a greater extent than the front, the motorman may rightfully assume that an adult person standing near the track who is apparently able to see, hear and move, and having notice of the approach of a street car and of the existence of the curve, will draw back far enough to avoid being struck by the rear of the car as it swings around the curve in the usual and expected manner, and, therefore, no legal duty is imposed upon the motorman to warn such a person against the possible danger of a collision with the rear, because of the swing, if he remains in the same position."

In *Kent* v. *Ogden, L. & I. R. Co.*, 50 Utah 328, 342, 167 P. 666, it was said by this court, as epitomized in the syllabus:

"Where a person waiting for a train at a crossing stop crossed the track as the train was approaching, but remained so close thereto that she was struck by the train, the position carelessly assumed by her was the cause of her injury, and not any negligence of the company respecting the speed of the train or the dazzling brilliance of the headlight."

And in the opinion the court said:

"If the deceased had stood upon the track under the circumstances here disclosed until she was struck, no one could, in reason, contend that the position which she carelessly assumed was not the proximate cause of her injury. If that be so, how can it reasonably be contended

that the position which she carelessly assumed, so near the track as to be in the path of the passing cars, likewise was not the cause of her injury? Where one voluntarily assumes a position on or so near a railway track that a train of cars in passing on the track must necessarily strike him, can reasonable minds differ as to whether his act in so placing himself was the proximate cause of injury in case the cars strike him? We think not. What is there to differ about? * * *

"The only remaining question, therefore, is, Is there anything in the evidence from which the jury could find an excuse for the conduct of the deceased in taking a position so near the railway track? * * * What others saw she must be deemed to have been able to see. As pointed out before, there is nothing disclosed by the evidence which would excuse her conduct. This court, in a number of cases, has illustrated and applied the conditions and circumstances under which a jury may find an excuse for the deceased's conduct in determining the question of contributory negligence. See *Newton* v. *Oregon Short Line R. Co.*, 43 Utah 219, 134 P. 567; *Gibson* v. *Utah L. & T. Co.*, 46 Utah 562, 151 P. 76; *Oswald* v. *Railroad Co.*, 39 Utah 245, 117 P. 46. In the first two cases we went as far as permissible to go in permitting a jury to pass upon the question of contributory negligence. In the last case cited we held that the plaintiff was prevented from recovering upon the ground of contributory negligence as a matter of law. In those cases it is held that so long as there is any question of fact upon which reasonable minds may differ and arrive at different conclusions in determining the question of negligence or contributory negligence, the question is for the jury, but when there are no facts or circumstances which would authorize reasonable minds to differ, the question becomes one of law. When, as in this case, there can be no doubt whatever regarding the proximate cause of the accident, nor any doubt that it was wholly within the power of the deceased at any moment before the collision to have averted it by merely moving a foot or two out of the zone of danger, this court cannot shirk its duty in determining the result. Before a judgment for damages can be sustained there must be some act, either of commission or omission, on the part of the defendant in the action constituting negligence, and it must not appear as a matter of law that the plaintiff's own conduct caused the injury and consequent damages. If no negligence is shown on the part of the defendant, or if it appear as a matter of law that the plaintiff's inexcusable negligence caused the injury and damages, then to allow a judgment for damages to stand would be equivalent to transferring property from one person to another without sanction of law, and hence without right. In this case it is quite immaterial whether the defendant was guilty of any or of all of the acts complained of, since all of those acts, taken either singly or in combina-

tion, merely constituted the ultimate, while the deceased's inexcusable conduct constituted the proximate cause of the injury."

In *Fittipaldi* v. *Philadelphia Rural Transit Co.*, 107 Pa. Super. 385, 163 A. 397, it was said [page 398] :

"As the bus moved forward and around the corner into Huntingdon pike, she remained standing in the cartway at a point which she had selected as a safe place to stand. The event proved she had been mistaken in her judgment, but defendant cannot be held liable for such mistake upon her part.

"We are all of opinion that the cause of plaintiff's regrettable injuries was her own lack of care under the circumstances."

In *Noonan* v. *Boston Elevated R. Co.*, 263 Mass. 305, 160 N. E. 811, the court said:

"There is nothing in the record to warrant a finding that the conductor or motorman knew or should have known that she was in a position of danger and was appreciative of it when the car was started. *Widmer* v. *West End Street Railway Co.*, 158 Mass. 49, 32 N. E. 899."

In *Steggell* v. *Salt Lake & Utah R. Co.*, 50 Utah 139, 167 P. 237, the Supreme Court of Utah held, according to the syllabus:

"The operators of a train have a right to assume that a person of mature years, sound of body and mind, who is walking on the track, on a bright day, with an unobstructed view, toward the rapidly approaching train, which on his entering on the track was more than a mile away, will see and hear, as is his duty, the approaching train, and will be timely in removing himself to a place of safety."

In *Miller* v. *Public Service Corp.*, 86 N. J. L. 631, 92 A, 343, L. R. A. 1915C, 604, the Court said:

"The rule approved by the weight of authority is that, in view of the well-known fact that in rounding a curve the rear end of a street car will swing beyond the track, and overlap the street to a greater extent than the front, the motorman may rightfully assume that an adult person, standing near the track, who is apparently able to see, hear, and move, and, having notice of the approach of a street car, and of the existence of the curve, will draw back far enough to avoid

being struck by the rear of the car as it swings around the curve in the usual and expected manner, and therefore no legal duty is imposed upon the motorman to warn such a person against the possible danger of a collision with the rear, because of the swing, if he remains in the same position. * * *

"The distance she was standing from the front of the car as it passed around the curve was not shown, and we think the motorman had a right to presume, either that she was beyond the swing, or that if not, she would move out of its range. We must take the case as it is presented to us; and, without proof of the exact position taken by the plaintiff with reference to the approaching car, beyond the fact that the front passed her without injury, we are asked to say that the motorman must assume, under such circumstances, that she would not act as a reasonably prudent person, and withdraw from a danger of which she was aware, or which she supposed did not exist because of the distance she was from the car, but about which, it subsequently appeared, she was mistaken. To accede to this request would impose a duty upon those operating street railways which in our opinion has no legal basis."

See, also, *Steinburg* v. *Milwaukee Elec. Ry. & L. Co.*, 222 Wis. 37, 266 N. W. 793.

What was said in *Ryan* v. *Milwaukee Northern R. Co.*, 186 Wis. 537, 538, 203 N. W. 340, 342, has some application here:

"Since it was necessary for the motorman to keep close watch forward, we do not consider that he was also required to look constantly to the rear to avoid such a collision as occurred. The law does not impose any such responsibility."

In *Weir* v. *Kansas City Rys. Co.*, 108 Kan. 610, 196 P. 442, the court said [page 443]:

"In another case where a person was walking in the wagonway of a street near a track, and the front end of the car had passed without contact, but he was struck by the hind end of the car as it went around a curve, it was said:

" 'Under such circumstances it was not the duty of the motorman to watch plaintiff after the front end of the car passed safely beyond her and the team, and therefore he could not be held to have knowledge of the danger assumed by her in walking between the team and the car toward the rear end.' *Wood* v. *Los Angeles R. Corp.*, 172 Cal. 15, 155 P. 68.

"In *Louisville R. Co.* v. *Ray*, (Ky.), 124 S. W. 313, it was held to be the duty of those in charge of a street car to keep a lookout so as to avoid injury to those who may be crossing a street in front of or near a moving car. 'But the rule has never been so extended as to require the employees in charge of the car to keep a lookout at corners and curves so as to prevent others using the street from colliding with the rear end of the car.' "

In *Zalewski* v. *Milwaukee Elec. Ry. & L. Co.*, 219 Wis. 541, 263 N. W. 577, the court said [page 580] :

"In the midst of the heavy traffic conditions at that intersection, it was plaintiff's duty to look and listen, and to observe and hear, all that could have been observed and heard by an adult pedestrian exercising ordinary care in that situation; and her failing to observe and hear the moving car, which she knew was close to her and about to proceed around the curve, and to keep out of its pathway by moving slightly ahead or aside, could well be deemed to constitute negligence which proximately contributed to her injury. *Peters* v. *Milwaukee Electric Ry. & Light Co.* 217 Wis. 481, 259 N. W. 724; *Hirschberg* v. *Milwaukee Electric Ry. & Light Co.*, 179 Wis. 175, 190 N. W. 829; *Bubb* v. *Milwaukee Electric Ry. & Light Co.*, 165 Wis. 338, 162 N. W. 180; *Schmidt* v. *Milwaukee Electric Ry. & Light Co.*, 158 Wis. 505, 149 N. W. 221; *Schliesleder* v. *Milwaukee Electric Ry. & Light Co.*, 147 Wis. 668, 134 N. W. 144."

In *Gannaway* v. *Puget Sound Traction, Light & P. Co.*, 77 Wash. 655, 138 P. 267, the rule was applied [page 268] :

"It is not a duty of street car companies to warn pedestrians on the streets that there is an overhang to an ordinary street car when it rounds a curve. This is a matter of common knowledge, and ordinary prudence requires that everyone take notice of the fact."

To like effect are the following cases: *Steggell* v. *Salt Lake & Utah R. Co.*, 50 Utah 139, 167 P. 237; *Noonan* v. *Boston Elevator R. Co.*, 263 Mass. 305, 160 N. E. 811; *Jelly* v. *North Jersey St. R. Co.*, 76 N. J. L. 191, 68 A. 1091; *Widmer* v. *West End St. R. Co.*, 158 Mass. 49, 32 N. E. 899; *Garvey* v. *Rhode Island Co.*, 26 R. I. 80, 58 A. 456; *Hayden* v. *Fair Haven & W. R. Co.*, 76 Conn. 355, 56 A. 613; *Steinberg* v. *Milwaukee Elec. Ry. & L. Co.*, 222 Wis. 37, 266 N. W. 793; *Weir* v. *Kansas City Rys. Co.*, 108 Kan. 610, 196 P. 442;

*Matulewicz* v. *Metropolitan St. R. Co.*, 107 App. Div. 230, 95 N. Y. S. 7; *Miller* v. *Public Service Corp.*, 86 N. J. L. 631, 92 A. 343, L. R. A. 1915C, 604; *Wood* v. *Los Angeles R. Corp.*, 172 Cal. 15, 155 P. 68; *Hoffman* v. *Philadelphia Rapid Transit Co.*, 214 Pa. 87, 63 A. 409; Note, 16 L. R. A., N. S., 890; Note, Ann. Cas. 1916E, 682; *Duffy* v. *Philadelphia Rapid Transit Co.*, 291 Pa. 564, 140 A. 496; *Zalewski* v. *Milwaukee El. Ry. & L. Co.*, 219 Wis. 541, 263 N. W. 577.

So too the law does not require operators of street cars or motor buses to keep a lookout to the rear to see that adults apparently in full possession of their faculties do not either move into the side of a car passing in front of them or unnecessarily place themselves in a position to contact the overhang of the car on a curve. *Wood* v. *Los Angeles R. Corp.*, supra; *Gribbins* v. *Kentucky Terminal Co.*, 150 Ky. 276, 150 S. W. 338 (citing *South Covington R. Co.* v. *Besse,* 108 S. W. 848, 33 Ky. Law Rep. 52, 16 L. R. A., N. S., 890, and *Louisville R. Co.* v. *Ray*, Ky., 124 S. W. 313) ; *Brightman* v. *Union Street R. Co.*, 216 Mass. 152, 103 N. E. 379; *Miller* v. *Public Service Corp.*, supra; *Greenleaf* v. *Public Service Corp.*, 88 N. J. L. 715, 92 A. 344; *Kaufman* v. *Interurban St. R. Co.*, 43 Misc. 634, 88 N. Y. S. 382; *Matulewicz* v. *Metropolitan St. R. Co.*, supra; *Beeck* v. *Coney Island & B. R. Co.*, Sup., 135 N. Y. S. 600; *Hoffman* v. *Philadelphia Rapid Transit Co.*, supra, Thus in *Miller* v. *Public Service Corp.*, supra, it was said:

"The rule approved by the weight of authority is that, in view of the well-known fact that in rounding a curve the rear end of a street car will swing beyond the track, and overlap the street to a greater extent than the front, the motorman may rightfully assume that an adult person, standing near the track, who is apparently able to see, hear, and move, and having notice of the approach of a street car, and of the existence of the curve, will draw back far enough to avoid being struck by the rear of the car as it swings around the curve in the usual and expected manner, and therefore no legal duty is imposed upon the motorman to warn such a person against the possible danger of a collision with the rear, because of the swing, if he remains in the same position."

And in *Garvey* v. *Rhode Island Co.,* supra, 58 A. 457, the court said:

"Every person * * * must be presumed to take notice of the obvious fact that the body of a street car, in rounding a curve must necessarily swing out some little distance from the track on the outside of the curve. And for one to place himself within reach of the swing or overhang of a car while it is in motion is as much a bar to his recovery in an action against the company as though he had negligently placed himself in front of a moving car and been injured thereby."

The court further held, according to the syllabus that plaintiff's placing himself within reach of the "overhang" of the car, and not the acceleration of its speed, was the proximate cause of the injury.

To like effect are the following cases: *Kiley* v. *Boston Elevated R. Co.,* 207 Mass. 542, 93 N. E. 632, 31 L. R. A., N. S., 1153; *Wheeler* v. *Des Moines City R. Co.,* 205 Iowa 439, 215 N. W. 950, 55 A. L. R. 473; *Widmer* v. *West End St. R. Co.,* supra; *Riddle* v. *Forty-Second St. R. Co.,* 173 N. Y. 327, 66 N. E. 22.

We find no error in the action of the trial court and the judgment is affirmed. Costs to Respondent.

FOLLAND, C. J., and MOFFAT, JJ., concur.

WOLFE, Justice (dissenting).

I think the evidence in this case should have taken it to the jury. The decision appears to me to rest on two wrong propositions: First, that where the front of the bus safely passes pedestrians standing in the walkway and follows the curve of the street car tracks, the driver has as a matter of law fully performed his duty toward such pedestrians.

Second, that the evidence in this case is not susceptible of a deduction (a) that the bus swerved suddenly toward the right after it started to turn or (b) that it is not susceptible of a deduction that the bus driver did not cut in more to the right of the car tracks during the turn to the east.

The first proposition is quite important and establishes as a rule of conduct for every driver of a bus or long truck, the rule which applied to motormen of street cars. The opinion says:

"The law seems to be well settled that the operator of a street car or motor bus when rounding a curve and moving in accordance with traffic laws and regulations and in broad daylight is justified in assuming that an adult person knowing that a bus is in the street and taking a position in the street far enough away to permit the front end of the vehicle to clear and pass him, will if necessary move back far enough to avoid being hit by the inward swing of the overhang at the middle or the outward swing of the rear end."

Also:

"The turn to the right therefore was not a sudden or abrupt turn but *an established arc for the buses* and street cars, as sweeping, gradual, and as wide as could be made around the corner." (Italics added.)

As we shall later see perhaps the turn in this case should have not followed the arc made by the track but should have been made farther on and then of necessity more sharply in order to avoid consuming too much of the pedestrian lane and more specifically to avoid colliding with the plaintiff.

In support of these statements above quoted from the prevailing opinion, authorities dealing with street cars moving on fixed rails are cited and quoted from. Only three cases involving a motor bus are given. In none are the facts or the situation the same. *Fittipaldi* v. *Philadelphia Rural Transit Co.*, 107 Pa. Super. 385, 163 A. 397, is a case where the person struck had just gotten off the bus and stepped back so as to indicate to the driver that he was aware of the bus turning and would allow for it—so it is really not in point.

The rule regarding street cars, moving on fixed rails, arose out of the necessity of the case. The street car could not depart from the rails in order to adopt itself to the circumstances surrounding it in any particular case. The rule that the motorman of a street car was under the general duty to operate his car as a prudent man would under the

same circumstances was circumscribed by the physical fact that he was compelled to operate it in a fixed route. It was only over that fixed route that he had to exercise the standard of care above set out. The standard of care is the same for a bus or a truck driver, but since his vehicle is not constrained to a fixed line of travel, this same standard may require him to proceed farther along the straight line before he makes the turn if the situation is such that the jury should be permitted to say whether such procedure was necessary to fulfill the requirements of due care. And the situation may be such if there are pedestrians in the walkway in proximity to his bus as the front of his bus or truck passes the walkway. I see no reason why we should hold that where a bus or motor vehicle driver starts at the safety zone to turn his car to the right (where the car track must because of the necessity of graduity of curve start to make the turn) and then parallels or straddles the car tracks passing the front of his bus safely by people standing in the cross walk that he is in law free from negligence when by going a few feet farther along in the straight line before he makes the turn he could avoid all danger of the overhang hitting any person in the walkway. He does not have to have eyes in the back of his head or "watch out behind while going forward." All the law requires him to do is what it requires every driver of a vehicle to do; that is, exercise such care under the circumstances as the circumstances call for and if the circumstances call for going forward a few feet and then making a sharper turn, he should do it. I do not think it is wise even to lay down a rule as to how far he must turn his head. That all depends on the circumstances.

There is another clear reason why the rule which applies to vehicles bound to tracks should not apply to those not bound to tracks. In the case of the former the action of the pedestrian in relation to the vehicle can rest upon the fair assumption that the car will stay in the tracks. He can from experience, therefore, know just how much leeway

he must give it to clear the overhang. But vehicles not bound to tracks are of all sizes, lengths, and varieties and they are free at any time to suddenly change their course and negative any fair calculation of a pedestrian. In a vehicle not constrained to tracks the back wheels on a turn always cut inside the arc made by the front wheels. That is so well known a fact to be observed from the tracks of any automobile turning in the snow or mud that I think judicial notice may be taken of it. Consequently, the back middle portion of the body of such turning car is swung more into the arc made by the front wheels than is the body of a street car. The tracks keep both wheels of a street car in the same arc. This means that the so-called overhang in the case of an automobile whose front wheels are equi-distantly straddling the tracks will be greater than in a car of equal length confined to the rails. This is on the supposition that there is a straddling of the rails without any swerving. If there is swerving, or if the right front wheel of the bus or truck is farther over toward the right, the body of the car may come even farther toward the right. This being the case, it may be of the very essence of due care for long busses and trucks to proceed a few feet beyond the point where the car tracks start to divert from the straight line before starting their turn, if there are persons in the crosswalk in position to, or approaching a position in which they might otherwise, be struck by the overhang. It is for the jury to say. I think this rule applied to busses will in every case depend upon niceties of measurements and refinements as to the relative position of different parts of the bus or truck to the pedestrian which will make it very difficult for juries to determine whether the driver exercised due care. How much can the driver vary from an equi-distant straddling of the tracks before the jury may determine whether he is guilty of negligence. The street car case presented a definite situation. Any small variation in the case of a motor car may have serious consequences. Furthermore in an intersection where there are no street car tracks on the turn may the driver

assure himself of immunity from the jury's appraisement of his conduct by showing that he followed a course where the street car tracks would have been had any been there? If so it gives him a preferred route and opens the case to endless issues.

The following excerpts from opinions and textbooks while not all on similar facts are sufficiently relevant to point the difference between the bus and street car cases. In *Plewe* v. *Chicago Motor Coach Co.*, 283 Ill. App. 57, it is stated:

"However, the motor driver did see the plaintiff pass in front of the motor coach, and it is a fact that the driver knew or should have known that if the turn made at this intersection is not wide enough the rear of the coach will come close to the curb. The motor driver cannot assume, in making the turn, that his only duty is to look ahead. At that time he had notice and knew that the plaintiff, together with other persons, was passing in front of the coach, and it was his duty to drive so that there would be proper clearance between the bus and the curb, to permit the plaintiff to reach the curb in safety. It was his duty in properly driving the bus to avoid injury to any person lawfully on the street at the time and under the circumstances. * * *

"The defendant further contends that the duty of the driver of the coach was only to keep a proper lookout ahead so as to avoid collisions with other vehicles or with pedestrians passing in front of the motor coach; that it is not the driver's duty to watch the rear of the motor coach being driven by him.

"In the instant case the driver had knowledge of persons passing in front of his bus while he was making the turn, and also that in making the turn unless a wide turn was made, by reason of the length of the motor bus, persons using the cross-walk would be caught at the curb line.

"* * * The driver in this case evidently assumed that he was clear of the curb and proceeded until he was stopped. The facts and circumstances in each case must be considered in order to determine whether there was negligence in the driving of the car."

Whereas, in the instant case the motorman states he did not see anyone near the track whilst in the Plewe Case he did, there is in this case evidence that he should have seen them because two of the witnesses said they had just skirted in front of his bus while they were going east on the pe-

destrian lane. And they remained standing in that lane within three feet of the bus while the front end passed them because it was not until the bus a moment later grazed their backs that they jumped out of the way. And one of them testified that the plaintiff was there also at that time. The jury could well have found that the bus driver should have seen these people and the plaintiff who was in relatively the same position as they were. If he has the same responsibility when he should have seen them as if he had seen them, the language of the Plewe Case is directly applicable.

In *W. & W. Pickle Canning Co.* v. *Baskin,* Ala. Sup., 181 So. 765, plaintiff was struck by a two-wheel trailer as he walked in the same direction as the truck and two feet away from the pavement. The court in affirming judgment for the plaintiff said [page 766] :

"When the truck driver was within fifty or seventy feet of plaintiff's intestate he pulled to the right in order to pass another large truck and trailer at that point, and we conclude from the record that it is a reasonable explanation of the accident that plaintiff's intestate was struck by the trailer, which doubtless swerved to some extent, as the driver righted the truck upon the road after thus passing the other truck. * * *

"* * * The jury were authorized to find from the evidence that the driver of the truck was negligent in driving in such close proximity to plaintiff's intestate, and in not taking proper precautions to avoid striking him with any part of the truck or trailer."

In *Ventimiglia* v. *Heiman Mfg. Co.,* Mo. App., 256 S. W. 139, recovery was had for the death of one standing on a curb in front of an electric light pole. The court said [page 140] :

"Though the wheels of the truck were not caused to run upon the sidewalk, the negligence of defendant's driver sufficiently appears from the fact that he drove the truck so close to the curved curb at this place as to cause a portion thereof to extend over the sidewalk and strike and injure the deceased while lawfully standing upon such sidewalk."

In *King* v. *Wolf Grocery Co.*, 126 Me. 202, 137 A. 62, the court held the question of whether defendant was negligent to be for the jury, stating [page 63] :

"* * * in turning the truck sharply to the right just as he passed her to go down Cross street, which of necessity would swing the rear end of the truck body some distance toward Mrs. King, and that he should have anticipated that the rear wheels * * * would be likely to skid * * *." *Texas Motor Coaches* v. *Palmer*, Tex. Civ. App. 97 S. W. 2d 253; *Dumochel* v. *Becce*, 119 Conn. 175, 175 A. 569; *Porter* v. *Green-Brier Quarry Co.*, 161 Md. 34, 155 A. 428; *Donovan* v. *P. Lorillard Co.*, 10 Cal. App. 2d 253, 51 P. 2d 142.

While these cases are distinguishable from the case at bar and may present situations where the negligence of the driver was more apparent, they stand essentially for the proposition that where a pedestrian is not wrongfully at the point where he was struck it is a question for the jury whether the vehicle was handled with due care even though the front end safely passed the person injured. In the instant case plaintiff was properly in the crosswalk. She stopped to permit the traffic to proceed over the cross-walk in response to a "go" signal both from the semaphore and the traffic officer. She was not compelled to run back to the east curb and thus intricate herself with oncoming traffic going north; nor was she compelled to hop toward the south in the safety zone although it might have been more advisable. She may have been guilty of contributory negligence if she saw or should have seen that the bus was turning. But as we shall later attempt to show, that, too, was a question for the jury. Being in a spot where she had the right to be, subject to her exercising due care, it was the bus driver's duty to operate the bus in view of her position with such care as a prudent driver should exercise under the circumstances. The jury should be permitted to pass on the question of whether this operater should not have proceeded farther north before the swing began.

In the case of *Barton* v. *Craighill*, 1920, 268 Pa. 464, 112 A. 96, a truck carried beams extending five feet beyond the

end of the truck and as the truck passed plaintiff on its left it turned sharply to the right causing the beams to extend beyond the course of the front wheels and strike the plaintiff. In affirming judgment for defendant, notwithstanding the verdict, the court stated:

"If the chauffeur had no reason to believe that anyone was near his truck who might be struck, he of course could be guilty of no negligence in turning on the street, but as according to the evidence, he was coming straight toward her, he must have seen her and at the same time *must have seen her step back to get out of the way*, showing that she knew what was approaching. We are therefore clearly of opinion that it was not his business to look back after he passed the place where *he saw her get out of the way*." (Italics added.)

This is in harmony with the holding of the prevailing opinion and evidently in harmony with the one bus case cited in that opinion also from Pennsylvania—the Fittipaldi Case, supra. But I do not think we should follow the Pennsylvania rule. Evidently Mr. Berry does not think so either for he states in his work on Automobiles (6th Ed.) Sec. 478, in considering the Barton Case, "It is submitted that the court was in error."

I think the rule laid down by the prevailing opinion should not be the law as to vehicles not confined to tracks.

I now discuss what I conceive to be the second erroneous holding of the prevailing opinion, to-wit: That the evidence is not susceptible of the deductions (a) that although the bus did, during the beginning of its turn, straddle the tracks approximately equi-distantly with its front wheels, it swerved to the right during its turn; or (b) that instead of straddling the tracks equi-distantly with its front wheels, its front wheels were farther over toward the right in the turn which would throw the back wheels still farther over toward the right. The reader may imagine that he is a jury man for the moment. The evidence he has before him is summarized as follows: The bus is $24\frac{1}{3}$ feet long, 7 feet 9 inches wide. The street car tracks are 4 feet $8\frac{1}{2}$ inches wide. With a bus astraddle of the rails equi-distantly on a straight track the

body of the bus hangs over the track 18 inches. There were double wheels on the rear and single wheels on the front. The outside face of the wheels is flush with the outside of the body of the bus. Walker, an employee of the defendant, testified that if the bus were placed on a "three center curve such as the one here" the overhang would be 25 inches. He did not state whether in such position the front or rear wheels would be equi-distantly astraddle the rail. The traffic officer testified he saw Mrs. Miller just as she was falling to the pavement. She was just a little bit off the east rail. "She was about three feet in front of the right rear wheel as I saw her falling." He blew his whistle as he saw her falling. The bus proceeded about six or seven feet after he blew his whistle before it stopped. The yellow lines marking the pedestrian lane are twenty feet apart. The front end of the bus was south of the south line of the pedestrian lane before it started. The tracks start to curve toward the east before they reach the south line of the pedestrian lane and while opposite the posts of the safety zone. The officer testified that the bus in making the turn would not be "more than 12 inches off this rail either way, this way or this way." It stopped about on the rails. Now as to the position of Mrs. Miller when she was hit. She said she was on line with the posts of the safety zone midway between the north and south line of the pedestrian lane. The posts are 7 feet 2 inches east of the east rail of the straight north and south track. Gates testified that he and Miss Everett had been coming east from the west and were in the pedestrian lane with their backs to the bus as the whistle blew for it to proceed. It brushed the backs of their coats. Miss Everett jumped. She was standing to the north of him and Mrs. Miller was standing north of her in the pedestrian lane. He states:

"The bus started up, and, as I said, we could feel the bus right against our back. I had on a rather draping coat, and the bus brushed against the coat, and the young lady I was with, who was to my left, the bus also brushed against her, and as it made the sharper turn, or as it turned the corner, the side of the bus struck the lady and it

hurled her around, her back was to the bus, it hurled her around so she fell underneath the bus. It pushed her forward, and she fell underneath the bus, and it looked like the bus was not going to run over her, but it kept on turning sharper, and as it turned sharper the back wheel ran over her leg, it looked like it ran over her hips, however her coat was there. * * *

"* * * As the bus hit her, as I said, it swung her around and knocked her down so that she·fell, and if the bus had been going straight it would have missed her. However, it seemed to make a very abrupt turn, right after it hit her."

He further states, "the front wheels as I remember as I looked up the side of the bus *were considerably off the track* * * * off to the right." The east part of the bus was "a good foot and a half to two feet as it passed us" off the east rails. (Italics added.)

Ruth Everett testified that just as she and Mr. Gates passed over the east track walking east, the light changed and they were approximately on line with the posts of the safety zone in the pedestrian lane. In her own language she states:

"The light changed, and as the light changed, this bus that was in back of me started to go forth, and it proceeded to turn a right turn, and I was watching it, and I thought it was going to hit me, so I jumped, I jumped eastward to get out of the way of the bus. * * *"

"Q. * * * Do you know whether or not the bus started to make its turn before it cleared the pedestrian walk? A. Well, it seems as though it must have, or else I wouldn't have had to jump from the position where I was standing."

The driver of the bus testified that when the light went green and the officer beckoned him to proceed he started and followed the car tracks as was his usual custom. He states that his two front wheels would be practically on the rails. Later he again testified as follows:

"A. The right front wheel is inside of the track, and the other one—of course, it is wider—it is on the west of the track.

"Q. What is wider, what do you mean by 'wider'; both wheels are the same width. What I am trying to get at was this: Was your car, your bus, as you went around there, on the center of the track; or either side

of the track, or straddle of the tracks, as you made the curve, or on them? A. They were on the tracks.

"Q. On the tracks? A. Yes."

His speed was three or four miles per hour as he proceeded around the curve. When he stopped the wheels of the bus were right over the rails.

"Q. Was that true of the front end and the rear of your bus? A. Yes, sir, they was all on the rails." (Obviously this could not be so.)

On cross-examination he testified:

"Q. So, if the right wheel of your bus was inside of the right rail, your left wheel would be at least three feet west of the left rail, wouldn't it? A. Well, it depends on how much you are in there, how much you are lapping over.

"Q. It couldn't be more, or it couldn't be less, could it, if your bus is about three feet wider than the rails? A. That would be only a foot and a half each side, wouldn't it?

"Q. That is right. Didn't I understand you to say that your right wheel was just inside of the right rail. Do you get my question; do you understand it? I don't want to take advantage of you? A. No; I tried to follow the rails around, which I always do, try to keep right on the rails. I might be off just a little but which wouldn't be very much."

He did not see the plaintiff or anyone in the pedestrian lane "in the radius of my bus."

Mr. Green, an employee of the Utah Power & Light, standing on the front platform behind the operator of the bus, when the plaintiff was hit, got out and noted that "the bus was standing on the rails, that is, the rails were within—I noticed the front right hand wheel was within a foot of the rail."

Mr. Guiver, another employee of the defendant company, testified that after the bus stopped the wheels were "straddling as much as you can to make them center."

Miss McFarland, driving an automobile which was waiting on the west line of the north bound traffic, testified that the bus straddled the rails around the turn. She did not see the accident nor the plaintiff prior to the accident.

Mrs. McFarland, mother of Miss McFarland, who was in the same automobile, testified the bus "was right on the rails" as it made the turn. She did not see the plaintiff until she saw her rolling on the ground after the accident.

It seems to me that the testimony of the police officer, the driver of the bus and Mr. Green and the McFarlands shows some discrepancy as to the path of the bus. All that can be deduced from all of it is that the bus generally traversed the path of the car tracks. But no accurate idea can be obtained as to where the front and back wheels were in relation to the street car tracks at the moment of the accident nor where it stopped after going six or seven feet after the accident. A reading of the record accentuates this confusion. And I think it will be a confusion introduced in the trial of any such case if the rule laid down in the prevailing opinion is the law. It is difficult to see how an intelligent jury could have reconciled the driver's testimony according to the simple law of physics with the distance between the wheels. The back wheels may have been well east of the curved track as it struck the plaintiff. Assuming that the police officer's testimony was correct that the wheels straddled the rails (and being out in front, it is likely that he saw the front wheels only) while on the turn rather than that the right front wheel traveled around the curve to the left of the right track as testified to by the driver, the jury may have readily concluded that the driver was negligent from the following testimony: All the testimony of the witnesses who saw plaintiff before the accident place her as from two to three feet east of the east rail. They do not specify as to whether they mean east of the straight north and south rail or east of the rail curving to the east, but the diagram where they placed their crosses, and a close reading of their testimony, bears out that they must have meant the latter. They could not have been brushed by the bus as it turned and been from two to three feet from the straight rail. They would have been run over because even on a straight course the bus overhangs the rail eighteen inches.

Once concluding from the foregoing evidence that the plaintiff was from two or three feet to the east of the curved rail—and there is no testimony to the contrary—they could reasonably further conclude either that the driver did turn suddenly more abruptly toward the right or that the back wheels cut inside the arc made by the front wheels to such an extent as to bring the body of the bus far more than twenty-five inches over the curved rail and that the driver was in either case negligent. The jury could, therefore, under all these circumstances, have concluded that he was negligent in not proceeding north a sufficient distance to clear anyone in the pedestrian lane which he should have seen or allowed for before he made his turn, or that if not negligent in that respect he turned to the right suddenly and was negligent in that respect. It is indeed difficult to see how the plaintiff could have been where all the witnesses who saw her before the accident claims she was and not be hit unless by the negligence of the driver. If the overhang on the curve is twenty-five inches and Mrs. Miller was from two to three feet from the east curving rail, the driver, unless he did turn in more sharply to the right, would have avoided her. At any event he would have avoided her if he had proceeded several feet farther north so that the back end of the bus could practically clear the pedestrian lane of any overhang caused by the turning. It is not our province to argue the evidence in the case for either side, but on a directed verdict we must give every intendment to the party ruled against. It seems to me that under any interpretation of this evidence a case to justify a directed verdict has not been made out.

The only other ground on which the verdict could be directed was that in law the evidence showed contributory negligence. From the testimony as set out above, it is just as evident that the court would have to leave this question to the jury as it is that he would have to leave the question of defendant's negligence to the jury. It seems more possible to hold that in law there was not evidence from which contributory negligence could be inferred than that there was evi-

dence from which it must be inferred. But there is conflicting evidence. The question should, therefore, have been left to the jury.

Before concluding, I desire to register an objection to the statement in the opinion that the evidence clearly shows that there was in the situation of this case no duty to sound the horn. While I consider this allegation of negligence not very strongly supported by evidence showing such a duty, even under the test laid down in the prevailing opinion regarding when warning signals are not required, I am not prepared to say, for reasons above stated, that the driver if he veered to the right in his turn should not have sounded a horn. Certainly in such case the plaintiff may not have had "actual knowledge of the * * * movement of the * * * vehicle." Where drivers of cars decide suddenly or are required to change their course, a "wake up" signal for those who may properly assume continuity of movement along the path theretofore chosen may be part of due care. We should not lay down too exact rules to govern when some act need or need not be done as a part of the content of due care. Nor am I so sure that the plaintiff had a duty to watch the astute police officer for every signal he might give regarding the bus. The officer might have been standing in a position where the bus or some vehicle made it impossible for her to see him stop the north-bound traffic and signal the bus to turn east. His signal was for the bus driver. I cannot say that the pedestrians caught half way across, rightfully stopping at a place where they are out of the line of on-coming traffic, have a duty to know what each whistle of the policeman may mean and see every signal he may give where such whistle-blowing and signal-giving are not meant to affect their movements.

The evidence was clearly for the jury. That two young people escaped by jumping out of the way when they felt the bus graze their backs is itself some evidence that the bus was taking in too much of the pedestrian lane in the turn it was making. Perhaps because the elderly lady was not

able to do likewise she was knocked down. Rules must be made which will protect elderly people whose age has robbed them of some of their alertness as well as for young people. The rule that applies to cars confined to tracks is not applicable here. It places too much responsibility on the pedestrian and not enough on the automobile driver. For the reasons above set out, I dissent.