**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jeffrey Richard POWELL,
Defendant–Appellant.**

No. 89–3509.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1990.

Decided April 11, 1991.

Rehearing and Rehearing In Banc
Denied June 11, 1991.

distribute marijuana in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. He reserved his right to appeal the district court's denial of his motion to suppress evidence obtained from a vehicle stop and subsequent searches, as well as his arrest. We conclude that he has no standing to challenge the vehicle stop, and that the subsequent searches did not violate his rights under the Fourth Amendment. We consequently affirm the conviction.

## I. FACTS AND PRIOR PROCEEDINGS

State trooper Richard Haycock patrols the highways of southern Utah. On December 17, 1988, he came upon a pickup truck with a large plastic shell known as a camper back over the bed. The pickup approached Interstate 70, a major east-west highway, from a smaller road that runs north from Arizona. As the pickup merged onto I–70 from the on-ramp, its driver failed to announce his movement by flashing the truck's directionals or using a hand motion. Officer Haycock signalled the camper's driver to pull over to the shoulder of the road.

After stopping, the pickup's driver left the cab of his truck and walked toward the rear of the camper shell, where Haycock met him. Haycock peered through a window into the camper-back's interior, and observed that the floor was raised above the level of the truck bed, and that the ceiling of the camper back's interior was approximately a foot lower than the roof, creating two storage spaces. The driver of the truck produced an Arizona driver's license bearing the name Michael Maroda. The truck's title documents, however, were issued in Wyoming to a Jeffrey Powell. When questioned by Haycock, Maroda informed him that the truck he was driving belonged to Powell, and that he was driving it from Arizona to Cheyenne, Wyoming, where he was to meet Powell. The address given on Powell's registration, however, was not Cheyenne, but Evanston, across the state.

As the conversation between Haycock and Maroda progressed Maroda appeared

Paul Kanter, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Charles W. Giesen, Morris D. Berman, Giesen & Berman, Madison, Wis., for defendant-appellant.

Before BAUER, Chief Judge, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Jeffrey Powell entered a conditional plea of guilty to one count of conspiring to

increasingly nervous. Based on his five years of experience as a trooper and the numerous drug seizures he had made during that time, Haycock suspected that Maroda was a courier transporting marijuana. Not one to beat around the bush, Haycock "just point blank asked Mr. Maroda how much marijuana was in the truck." Evidentiary Hearing Transcript at 40. Maroda responded that he would show Haycock that there was none. When Maroda opened the door of the camper back, the strong scent of fresh marijuana rose up to greet Haycock's expert nostrils.

Upon smelling the marijuana, Haycock frisked Maroda for weapons, handcuffed him, and called for backup. With Maroda standing on the side of the road, Haycock began to examine the concealed areas of the camper back. Seeing Haycock struggle with the screws that secured the plywood floor, Maroda offered him the use of an electric screwdriver kept in the cab of the truck. Upon opening the floor and ceiling panels, Haycock observed a number of large bundles wrapped in tape. At this point, the trooper read Maroda his rights.

Haycock, however, had his sights on bigger game than Maroda. He asked Maroda to whom he was delivering his load, and Maroda responded that it was Jeffrey Powell, and that he was en route to West Bend, Wisconsin to meet him. Maroda showed Haycock a notebook with information on the route Maroda was to take to Wisconsin, as well as the phone number Powell had instructed Maroda to call when he reached West Bend. With the assistance of federal drug enforcement agents based in Milwaukee, Haycock set to work arranging the delivery of the marijuana-laden truck to Powell. He arranged for state troopers to reassemble the camper back and drive the pickup to Wisconsin and for other troopers to fly with Maroda from Salt Lake City to Wisconsin. When Maroda arrived in Milwaukee, he told DEA agents that he had been contacted by Powell in Arizona and offered $7,000 to drive the pickup to Wisconsin. Powell told Maroda that when he delivered the marijuana he would be given $100,000 in cash to store for Powell in Arizona, as well as a plane ticket from Chicago to Arizona.

DEA agents escorted Maroda to West Bend, where on December 19, 1988, two days after the Utah vehicle stop, he was reunited with the truck. While three law enforcement officers hid in the camper back, Maroda called the phone number Powell had given him and was told to wait where he was. A few minutes later, Powell drove up in his car and instructed Maroda to follow him. When the pickup stopped in the driveway of a house in West Bend, the DEA agents emerged and arrested Powell. A search of Powell's person revealed a small amount of cocaine. A search of the trunk of his car revealed a suitcase containing $111,000 in cash and a small amount of marijuana.

A grand jury in the Eastern District of Wisconsin indicted Powell on several drug-related charges and one violation of the Travel Act. Powell filed motions to suppress his arrest and all evidence found in the truck, on his person, or in his car, on the ground that they were obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. He challenged the vehicle stop in Utah, Trooper Haycock's subsequent visual inspection and physical search of the pickup, and the Wisconsin searches of his person and car.

An evidentiary hearing on Powell's motion to suppress was convened before a magistrate, who heard testimony from Haycock and the DEA agents who arrested Powell and searched him and his car. Maroda was subpoenaed but failed to appear at the initial hearing. The magistrate then issued a preliminary recommendation to the district court that all of Powell's motions to suppress be denied. This decision was based on the magistrate's determination that Powell lacked standing to challenge the search because he had not presented any evidence that he was the owner of the truck. The magistrate concluded in the alternative, however, that if the district court were to decide that Powell did have standing to contest the stop of the truck, his motions to suppress should

be granted because the Utah statute that Trooper Haywood claimed as the basis for the stop did not require motorists entering a divided highway to signal their move from an on-ramp onto a highway. The magistrate labeled both these conclusions as preliminary and invited Powell to renew his motion to suppress if and when Maroda testified.

A few weeks later, Maroda appeared before the magistrate at a supplemental hearing. He was questioned about the vehicle registration found in the truck at the time of the vehicle stop, and identified the signature on the registration as Powell's. This fact, the magistrate ruled, sufficed to establish that Powell had standing to challenge Trooper Haycock's stop of the pickup. However, the magistrate concluded that the consent Maroda gave to Officer Haycock's search of the truck wiped away the taint of the prior unconstitutional stop. Accordingly, the magistrate recommended that the district court deny Powell's motions to suppress.

The district court disagreed with the magistrate's conclusion that the Utah statute Officer Haycock relied on did not require vehicles entering limited access highways to signal their lane changes. According to the district court, the statute, while ambiguous, could be read to require a motorist entering a highway to signal, and that Officer Haycock's stop was supported by Utah traffic law and therefore was not pretextual. Turning to the question of Powell's standing to challenge the stop, the district court rejected the magistrate's conclusion that Maroda's testimony and the other evidence presented at the supplemental suppression hearing was sufficient to establish that Powell owned the pickup. Finding that "the defendant has not proven he had the right to control the use of or exclude others from using the vehicle," Decision and Order at 20, the district court denied Powell's motions to suppress on the ground that he had no standing to challenge Officer Haycock's stop of the truck driven by Maroda. Following the denial of his suppression motions, Powell entered a conditional plea of guilty, reserving the right to appeal the district court's refusal to suppress the fruits of Haycock's vehicle stop.

## II. WAS THE STOP VALID?

All parties concede that Maroda failed to signal his merge from the on-ramp onto Interstate 70. Utah Code Ann. § 41–6–69(1)(a) (1987) provides that "[a] person may not turn a vehicle or move right or left upon a roadway or change lanes until the ... appropriate signal has been given." As applied to the facts before us, the phrase "may not turn a vehicle or move right or left upon a roadway or change lanes" is ambiguous, because it does not answer the question of whether a highway on-ramp is a "lane" considered part of the "roadway" itself. Neither does the definition of "roadway" contained in Utah Code Ann. § 41–6–1(37) (1987). No Utah court has clarified this ambiguity; cases decided under the current version of § 41–6–69 and its predecessors concern accidents at intersections, *see, e.g., Hansen v. Nicholas Moving & Storage*, 451 F.2d 319 (10th Cir.1971); *Cederloff v. Whited*, 110 Utah 45, 169 P.2d 777 (1946); *Miller v. Utah Light & Traction*, 96 Utah 369, 86 P.2d 37 (1939).

■ Questions of statutory interpretation are questions of law, which we review *de novo. McNary v. Haitian Refugee Center*, — U.S. —, 111 S.Ct. 888, 897, 112 L.Ed.2d 1005 (1991); *United States v. Teta*, 918 F.2d 1329, 1332 (7th Cir.1990). As did the magistrate, we find the administrative interpretation of § 41–6–69 contained in the Utah Driver Handbook (rev. ed. 1988) helpful in interpreting the statute. The Handbook is distributed by the State Department of Public Safety (the state agency responsible for highway safety, Utah Code Ann. § 41–13–4(1)) to Utah residents studying for the state's operator's license examination. It "contains the rules which [motorists] must follow when operating any motor vehicle on the road in Utah." *Id.* at title page. In instructing drivers how to turn at intersections, the Handbook requires the use of signals. *Id.* at 13–14. However, the Handbook does not instruct

drivers to signal when entering freeways, either in its instructions concerning freeway driving or in a diagram showing procedures to be followed by motorists merging from an on-ramp onto a highway. *Id.* at 52–54. For want of a better guide to the application of the statute to the facts in this case, we defer to the Handbook, which presents the views of the administrative agency charged with enforcing Utah's traffic laws. *Chemical Mfrs. Assn. v. NRDC,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *Wisconsin v. Bowen,* 797 F.2d 391, 397 (7th Cir.1986); *Concerned Parents of Stepchildren v. Mitchell,* 645 P.2d 629, 633 (Utah 1982); *Technomedical Labs v. Utah Securities Div.,* 744 P.2d 320, 323 (Utah Ct.App.1987).

■ Moreover, as the magistrate recognized, requiring motorists to signal a merge from an on-ramp to the right lane of a highway does not serve the usual function of signaling, namely giving notice to other motorists of a lane change or turn. The only reason to use an on-ramp is to enter a highway, so a motorist on a highway does not need to see a turn signal to know that a vehicle she observes on an adjacent on-ramp wishes to merge. Furthermore, most on-ramps approach highways at an angle before curving to parallel the highway. Because of the curve and the space between the highway and the more distant portions of the on-ramp, for most of the length of the on-ramp before the turn signal (which the Utah statute requires be given for at least three seconds before a lane change, § 41–6–69(1)(b)) could not be seen by motorists already on the highway. We agree with the magistrate that neither logic nor deference to the views of administrative agencies supports an interpretation of § 41–6–69 that requires motorists in Utah to signal merges from on-ramps onto highways. Since, under this interpretation of the statute, Officer Haycock did not "have probable cause to believe that [Maroda] had committed or was committing an offense" when he stopped him, *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989), his stop was invalid.

## III. DOES POWELL HAVE STANDING TO CHALLENGE THE STOP?

■ Our conclusion that Officer Haycock's stop of the pickup was not supported by probable cause that a motor vehicle violation had occurred does not, however, lead us to reverse the district court's denial of Powell's motions to suppress all evidence derived from the vehicle stop as well as his arrest. Rather, it leads to the question of whether Powell has sustained his burden of showing that he had a legitimate expectation of privacy implicated by the invalid vehicle stop. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Duprey,* 895 F.2d 303, 309 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990). This requirement, often labeled Fourth Amendment standing, is rooted in the principle "that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

■ In considering the question of Powell's standing to challenge the stop of the truck, both the magistrate and the district court focused on the question of whether Powell had established a possessory interest in the vehicle. We do not reach the question of whether Powell owned the truck. We believe the better view is that ownership of a vehicle is largely irrelevant to the question of whether a given defendant has standing to challenge the stop of that vehicle.

When resolving issues of Fourth Amendment standing, it is important to distinguish between different government intrusions that implicate different constitutionally protected interests. Searches implicate expectations of privacy in the places or things searched. Possessory interests are often important in deciding who has standing to challenge a search because of our society's shared belief that, to a greater or lesser extent, ownership carries with it a

right to exclude. Ownership creates, in other words, an expectation of privacy "that society is prepared to recognize as 'reasonable.'"[1] *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The Fourth Amendment protects this expectation.

By contrast to the expectation of privacy in places and things implicated by a search, the interests implicated by a vehicle stop are motorists' "freedom from random, unauthorized, investigatory seizures," *Michigan Dept. of Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 2492, 110 L.Ed.2d 412 (1990) (Stevens, J., dissenting), and the interest in avoiding the "substantial anxiety," *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), these stops may create. Both these interests are personal to the driver and passengers in the car stopped, who have their travel interrupted by the sight of a state patrol cruiser or police car looming large in the rear view mirror, are detained on the side of the road, have their identifying documents inspected by the trooper or policeman, and may even be asked to leave their vehicles for the duration of the questioning, *see Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

The different interests implicated by searches and vehicle stops have, not surprisingly, led courts to develop different rules concerning who may challenge a stop and who may challenge a search. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979), the Supreme Court held that passengers in an automobile who "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized," had no standing to challenge the search of the car in which they were driving. *Id.* at 148, 99 S.Ct. at 433. By contrast, numerous state courts and one federal appeals court have concluded that passengers do have standing to challenge a vehicle stop. *See, e.g, United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989); *State v. Harms,* 233 Neb. 882, 449 N.W.2d 1, 4 (1989) (collecting cases); *People v. Millan,* 69 N.Y.2d 514, 516, 516 N.Y.S.2d 168, 169, 508 N.E.2d 903, 904 (1987); *State v. Epperson,* 237 Kan. 707, 703 P.2d 761, 768–69 (1985); *State v. Haworth,* 106 Idaho 405, 405–06, 679 P.2d 1123, 1123–24 (1984); *State v. Eis,* 348 N.W.2d 224, 226 (Iowa, 1984); *People v. Bradi,* 107 Ill.App.3d 594, 63 Ill.Dec. 363, 366, 437 N.E.2d 1285, 1288 (2d Dept.1982); *State v. DeMasi,* 419 A.2d 285, 294–95 (R.I., 1980), *cert. granted and decision vacated on other grounds,* 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981).

These cases recognize that the intrusion a vehicle stop causes is personal to those in the car when it occurs. The personal nature of the interests implicated by a vehicle stop persuade us that a vehicle owner who is not in his car at the time it is stopped should not, absent unusual circumstances not present in this case, have standing to object to the stop. It is conceivable that a stop might implicate a vehicle owner's possessory interests, as where the stop meaningfully deprives the vehicle owner of the anticipated use of his car or truck. As in so much of the law of search and seizure, the infinite factual permutations with which courts may be faced caution against formulating bright line rules.

No bright line is needed, however, to decide this case. Powell gave his truck to Maroda not for a drive around the block but for a three-day, 2,000 mile journey across the better part of the continental United States. At the time Officer Haycock stopped Maroda, Powell was over 1,000 miles from the point in southern Utah where the constitutional violation occurred and two days from Maroda's expected ar-

---

1. Of course, even in the context of searches, ownership is not dispositive of the question of standing. As the Supreme Court observed in *Mancusi v. DeForte,* "capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from government intrusion." 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968); *see also United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980) ("property rights are neither the beginning nor the end of this Court's inquiry" into Fourth Amendment standing).

rival. The portion of the detention of the truck that occurred before Officer Haycock came reasonably to suspect that Maroda might be carrying drugs did not meaningfully deprive Powell of the use of his truck. To be sure, actions taken by Haycock and other law enforcement personnel occurring after the glimpse of the false floor and ceiling of the camper back and the whiff of marijuana did implicate Powell's constitutional rights, as discussed below. However, since he was not at the scene of the stop at the time it occurred, his interest in using the highways undisturbed by random and intrusive police action and the anxiety it causes was not implicated by the search. The only anxiety the stop caused Powell came with the knowledge that the fruits Officer Haycock obtained through his violation of Maroda's Fourth Amendment rights were used as the basis for Powell's arrest and might be introduced as evidence against him at trial. As such, Powell's motion to dismiss this evidence is nothing more than an "attempt[ ] to vicariously assert violations of the Fourth Amendment rights of others" that *Alderman* and its progeny have condemned. *Salvucci,* 448 U.S. at 86, 100 S.Ct. at 2550.

## IV. REMAINING FOURTH AMENDMENT ISSUES

Powell also challenges the visual inspection of the camper back Haycock made when he looked through the back window of the plastic shell, Haycock's entry into the camper back and his removal of the false floor and false ceiling that exposed the two hidden storage areas, Powell's arrest in Wisconsin, and the search of his car at the time of his arrest. As to Officer Haycock's glance through the window into the camper-back, the Supreme Court observed in *Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990), that "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." Here, Powell's only basis for objecting to what Officer Haycock observed through the window of the truck as he stood outside is that Officer Haycock had gained the ability to look through the window only by means of the prior invalid vehicle stop. As we have already concluded, however, he has no standing to object to that stop. By extension, Powell has no standing to challenge Haycock's glance through the window.

 Assuming that he is the owner of the truck or claims a possessory interest in its contents, Powell does have standing to challenge both Haycock's entry into the camper back when he smelled the marijuana and his subsequent removal of the false floor and false ceiling. However, both fall within exceptions to the warrant requirement. What brought Haycock to the door of the camper back was Maroda's offer to show Haycock that there was nothing in the truck. Maroda's invitation, which he had apparent authority to make, *see Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148 (1990), created consent for Haycock to poke his head through the door of the camper back. The smell of marijuana, the false floor and ceiling, and Maroda's nervousness together gave Haycock probable cause to inspect the truck, which falls within the vehicle exception to the warrant requirement. *See California v. Carney,* 471 U.S. 386, 390–93, 105 S.Ct. 2066, 2068–70, 85 L.Ed.2d 406 (1985); *Chambers v. Maroney,* 399 U.S. 42, 50–51, 90 S.Ct. 1975, 1980–81, 26 L.Ed.2d 419 (1970).

 Turning to the conduct of the DEA agents in Wisconsin, the discovery of marijuana in the pickup, as well as Maroda's statements to Haycock and the Milwaukee DEA Agents and the notebook of instructions from Powell, established probable cause for his arrest; the contemporaneous search of Powell's person was a legitimate search incident to arrest. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969); *United States v. Edwards,* 885 F.2d 377, 383 (7th Cir.1989). The search of Powell's car trunk was supported by Maroda's statements to the DEA that Powell had told him that at the time he received the marijuana he would give Maroda $100,000 in cash to take back to Arizona, statements which

gave the police probable cause to believe Powell was presently in possession of the cash and that it was somewhere in his car. Like the camper, the car falls within the vehicle exception, and DEA agents with probable cause to believe that evidence of criminal activity was located somewhere within the vehicle could search the trunk. *United States v. Ross*, 456 U.S. 798, 823, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); *United States v. Alvarez*, 899 F.2d 833, 839 (9th Cir.1990).

### V. CONCLUSION

Because we decide that Powell has no standing to challenge the one Fourth Amendment violation at issue in this case, his conviction is

AFFIRMED.