**UNITED STATES of America, Plaintiff,**

**v.**

**Gary D. GOLD, Defendant.**

**NO. IP 99–110–CR H/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 16, 1999.

Winfield Ong, Office of the U.S. Atty., Indianapolis, IN, for U.S.

James McKinley, Indiana Federal Community Defender, Indianapolis, IN, for Defendant.

## ENTRY ON DEFENDANT'S MOTION TO SUPPRESS

HAMILTON, District Judge.

A federal grand jury indicted defendant Gary D. Gold for violating 18 U.S.C. § 922(g)(1) by possessing a firearm after having been convicted of a felony. Indianapolis police officers seized the firearm in question and arrested Gold after an officer stopped the car Gold was driving and issued a ticket for changing lanes without using his turn signal. After the officer stopped Gold's car, he ordered Gold to step out of his car so he could explain the ticket, and then started to frisk Gold for weapons. Gold ran, dropped the firearm,

and was arrested. Gold has moved to suppress all evidence, including the firearm, obtained by law enforcement after the vehicle stop. The court held an evidentiary hearing on November 4, 1999. Pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure, the court now states its findings of fact and conclusions of law. As explained in detail below, the court grants Gold's motion to suppress because the officer did not have probable cause to stop Gold's car for the charged traffic violation.

### Findings of Fact

In the evening of April 8, 1999, IPD Officer Thomas Feeney was parked in a parking lot near the intersection of Arlington Avenue and 21st Street on the east side of Indianapolis. IPD had received complaints about possible drug trafficking at a nearby house, and Officer Feeney and IPD Officers Cavanaugh and Hopkins were observing the house. Just before 9:00 p.m., the officers observed a late model blue Cadillac pull up in front of the house. The driver, who later turned out to be defendant Gold, stopped the Cadillac in front of the house so that the street was blocked. The driver and the passenger then got out of the Cadillac and walked up to the house, leaving the Cadillac's lights on and its engine running.

A few minutes later, the driver emerged from the house alone and returned to the Cadillac. The Cadillac pulled away from the house and began heading west on 21st Street. Officer Feeney began to follow the Cadillac so that he could check the license plate on the police computer. The driver stopped the Cadillac at the traffic light at 21st Street and Arlington Avenue.

As one approaches that intersection from the east, there are three marked lanes for westbound traffic. The left lane is for left turns south onto Arlington. The right and center lanes are simply normal traffic lanes. See Def. Ex. D (photograph of intersection from the west). The Cadillac was the first car stopped in the right westbound lane. Stopped next to it in the center lane was a pickup truck. Officer Feeney stopped his marked patrol car in the center lane directly behind the pickup truck.

The lane designations on westbound 21st Street change at the intersection with Arlington. West of the intersection, there are no broken white line markings to identify two separate lanes of westbound traffic. Instead, the pavement narrows quickly so that the westbound traffic must merge into one lane approximately 275 feet west of the intersection. The record before the court does not indicate that there are any signs warning westbound drivers that a "lane ends" or that they must merge into one lane.

Although the Cadillac was not signaling a turn, Officer Feeney was expecting the Cadillac to turn right, to go north on Arlington. When the light for westbound traffic on 21st Street turned green, however, both the Cadillac and the pickup truck drove straight through the intersection. The Cadillac accelerated rapidly. Without using a turn signal, the Cadillac pulled in front of the pickup truck as the westbound vehicles formed one lane of traffic.

Officer Feeney passed the pickup truck on the left and turned on his flashing lights to stop the Cadillac. The Cadillac immediately came to a stop on the shoulder of 21st Street in front of a house located at 5920 East 21st Street. The Cadillac's left tires came to a stop on the white line marking the edge of the traffic lane. Officer Feeney stopped his patrol car directly behind the Cadillac. His patrol car's headlights pointed at the rear of the Cadillac. Officers Cavanaugh and Hopkins parked their patrol car behind Officer Feeney's car.

Officer Feeney approached the front passenger side door of the Cadillac and asked the driver if he was having a medical emergency. After the driver replied no, Officer Feeney asked the driver to identify himself. The driver handed Officer Feeney an Indiana driver's license with the name Gary Gold. Officer Feeney informed Gold that a computer check of the

Cadillac's license plate had shown the plate was registered to two persons other than Gold. Gold said he had recently purchased the Cadillac and had not yet changed the registration. Officer Feeney then told Gold that he had pulled him over for failing to use his turn signal when changing lanes.

Officer Feeney went back to his patrol car and wrote Gold a traffic ticket for failing to signal when changing lanes. Ex. 1. Officer Feeney also wrote a warning for improper use of a license plate Ex. 2. When he returned to the Cadillac, Officer Feeney again walked to the passenger side. Because the Cadillac was parked on the edge of the roadway and because of the traffic, Officer Feeney was also concerned about the risk that he could be struck by a car if he approached the Cadillac on the driver's side. (Officer Feeney had been injured that way in a previous traffic stop, so he was especially aware of that danger.) Officer Feeney spoke through the passenger side window and asked Gold to exit the car so the ticket could be explained to him. The court credits Officer Feeney's testimony about the location of the Cadillac and his safety concerns, as well as his testimony that it was his "normal practice" to ask drivers to step out of a car in such situations because he does not like to hand a traffic ticket through a passenger window. After asking Gold to step out of the Cadillac, Officer Feeney walked to the back of the Cadillac.

Standing near the Cadillac's trunk, Officer Feeney watched as Gold stepped out of the car. Officer Feeney testified that Gold had his back turned "directly toward" him as he got out of the Cadillac. Gold was wearing a white, baggy T-shirt. Officer Feeney observed that the T-shirt was tucked into Gold's waistband and that it was bunched up around Gold's waist.

After noticing the bulges near Gold's waistband, Officer Feeney asked Gold if he had a weapon. Gold answered that he did not have a weapon. Officer Feeney asked Gold to place his hands on the trunk of the Cadillac so Officer Feeney could pat him down for weapons. When Gold asked why he wanted to frisk him, Officer Feeney said he did not "feel like getting shot tonight." Officer Feeney has patrolled the area near the intersection of 21st Street and Arlington for several years and knew that it is a relatively high crime area. Officer Feeney also knew that a few weeks before he stopped Gold, two people had been found shot to death in a car near the same intersection. At that point in the encounter, Officer Feeney had reasonable grounds for thinking Gold might have a weapon hidden in his waistband.

After Officer Feeney indicated that he wanted to frisk Gold for weapons, Gold took a half step backwards. Officer Feeney grabbed Gold's arm. Gold threw his arm up in the air, broke free, and began running south across 21st Street. Officers Feeney, Cavanaugh, and Hopkins chased Gold across 21st Street. Officer Feeney pointed a flashlight at Gold's back as they ran. The officers saw Gold reach toward his back as he ran, pull a gun out of his waist, and drop the gun. Officer Feeney recovered the gun and Officer Cavanaugh apprehended Gold. A federal grand jury later indicted Gold for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

### Conclusions of Law

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). As a general rule, a police officer's stop of a vehicle is reasonable and thus constitutional if the officer has "probable cause to believe that a traffic violation has occurred." *Id.* at 810, 116 S.Ct. 1769, citing *Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and

**940**

*Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

■ After a police officer makes a justified stop of a vehicle, the officer has the power to order the driver and passengers to step out of the vehicle. See *Maryland v. Wilson,* 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. at 111, 98 S.Ct. 330. If the officer has reasonable, articulable grounds for believing a person involved in the stop may be carrying a hidden weapon, the officer may conduct a quick frisk or "pat-down" to check for weapons. See *Pennsylvania v. Mimms,* 434 U.S. at 111–12, 98 S.Ct. 330.

In this case defendant Gold argues that Officer Feeney violated his Fourth Amendment rights at three distinct points: (1) stopping Gold for a traffic violation; (2) ordering Gold to step out of his car; and (3) attempting to frisk Gold for weapons. If Officer's Feeney's actions were unconstitutional, the gun seized as a result must be suppressed pursuant to the exclusionary rule.[1]

The court concludes that Officer Feeney did not have probable cause to stop Gold for supposedly changing lanes without signaling. There were no distinct lanes requiring a signal before a change of lanes. Because the officer did not have probable cause, the stop was illegal and the exclusionary rule requires the court to exclude all evidence obtained after the traffic stop.

## I. *The Traffic Stop for Failing to Signal a Lane Change*

■ Under *Whren v. United States,* the inquiry into probable cause is an objective one: did the officer have probable cause to believe the person had violated a traffic law? 517 U.S. at 810, 116 S.Ct. 1769. The Court rejected in *Whren* the argument that an otherwise valid traffic stop would be invalid if a reasonable officer would not have stopped the car for the suspected violation, so that the traffic stop was merely a pretext for investigating some other

suspected wrongdoing. *Id.* at 813, 116 S.Ct. 1769. Thus, under *Whren,* if Officer Feeney in fact had probable cause to believe Gold had violated a traffic law, his stop would have been valid even if, as is highly probable here, Officer Feeney chose to exercise his discretion in enforcing traffic laws to stop Gold because he suspected Gold might have been involved in some other criminal activity.

■ The government contends that Officer Feeney had probable cause to stop Gold for failing to signal when changing lanes. Officer Feeney issued a Uniform Traffic Ticket stating that Gold violated Indiana Code § 9–21–8–24, which provides:

> A person may not: (1) slow down or stop a vehicle; (2) turn a vehicle from a direct course upon a highway; or (3) *change from one (1) traffic lane to another;* unless the movement can be made with reasonable safety. Before making a movement described in this section, a person shall give a clearly audible signal by sounding the horn if any pedestrian may be affected by the movement *and give an appropriate stop or turn signal* in the manner provided in sections 27 or 28 of this chapter if any other vehicle may be affected by the movement.

Ind.Code § 9–21–8–24 (emphasis added). Based on Officer Feeney's testimony and the photographs of the scene, Gold did not violate this provision. He did not cross any lane lines when he pulled in front of the pickup truck. He was not changing "from one traffic lane to another."

The Seventh Circuit addressed a similar argument when it concluded that an officer lacked probable cause to stop a truck driver for failing to use his turn signal when merging from an on-ramp onto an interstate highway. *United States v. Powell,* 929 F.2d 1190, 1194 (7th Cir.1991). The stop in question occurred in Utah. The

---

**1.** The Supreme Court of the United States adopted the exclusionary rule in *Weeks v.*

*United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

government argued that the driver had violated a Utah traffic law that stated: "A person may not turn a vehicle or move right or left upon a roadway or change lanes until the ... appropriate signal has been given." *Id.* at 1193. The Seventh Circuit found the statute ambiguous because it did not "answer the question of whether a highway on-ramp is a 'lane' considered part of the 'roadway' itself." *Id.*

Because no Utah court had clarified the statute's ambiguity, the court turned to the driver handbook distributed to Utah residents by the State Department of Public Safety. The court noted that "the Handbook does not instruct drivers to signal when entering freeways, either in its instructions concerning freeway driving or in a diagram showing procedures to be followed by motorists merging from an on-ramp onto a highway." *Id.* at 1193–94. The Seventh Circuit concluded that "neither logic nor deference to the views of administrative agencies supports an interpretation of § 41–6–69 that requires motorists in Utah to signal merges from on-ramps onto highways." *Id.* at 1194. Thus, the officer did not have probable cause to believe that the driver had committed an offense when he stopped the driver. *Id.* Because the officer lacked probable cause, the stop was invalid. *Id.*, citing *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989).[2]

Gold relies on the recent case of *Peck v. State*, where the Indiana Court of Appeals addressed the language in Ind.Code § 9–21–8–24, the statute Officer Feeney cited Gold for violating. 705 N.E.2d 188 (Ind. App.1998), *reversed*, 712 N.E.2d 951 (Ind. 1999). In *Peck*, a police officer stopped a driver for turning without signaling. As a result of the stop, the officer learned that the driver had a suspended driver's license because he was a habitual traffic violator. The driver moved to suppress all evidence

obtained as a result of the stop on the ground that the stop was illegal.

The trial court denied the motion to suppress. The Court of Appeals reversed, and the Supreme Court of Indiana later reinstated the trial court's decision denying the motion to suppress. The appellate court noted that § 9–21–8–24 prohibits a driver "from, among other things, turning his vehicle unless such turn can be made with reasonable safety." 705 N.E.2d at 189. The court also noted that a driver must "use an appropriate signal if his turn may affect a pedestrian or other vehicle." *Id.* Because nothing in the record indicated that the driver could not turn his vehicle with reasonable safety and because the court determined there were no other vehicles or pedestrians in the area, the court found that the driver was not required to signal before turning. The officer's reliance on the driver's failure to signal was therefore unjustified and the stop was illegal. *Id.*, citing *Cash v. State*, 593 N.E.2d 1267 (Ind.App.1992).

On transfer, the Supreme Court of Indiana vacated the appellate court's opinion and affirmed the trial court's ruling. 712 N.E.2d 951 (Ind.1999). The state supreme court did not disagree with the appellate court's interpretation of Ind. Code § 9–21–8–24. Instead, the supreme court relied on the very next Indiana Code provision, first discussed by Judge Staton in his dissent from the appellate court decision. As Judge Staton had pointed out, Ind.Code § 9–21–8–25 provides in relevant part: "A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes." The supreme court found that the driver had violated Ind.Code § 9–21–8–25 by failing to signal before turning. *Peck*, 712 N.E.2d at 951. Therefore, the court held, the officer's

---

**2.** The Seventh Circuit went on to hold in *Powell*, however, that the defendant did not have standing to contest the legality of the stop, 929 F.2d at 1196, so the analysis of the Utah statute regarding turn signals for chang-

ing lanes was *obiter dicta*, strictly speaking. Nevertheless, district courts in this circuit are well advised to pay close attention to the court's considered *dicta*.

"stop was justified and the trial court did not err in admitting the evidence obtained in it." *Id.* Because *Peck* did not specifically address the issue here—what constitutes a lane change for purposes of the statute—*Peck* offers only limited guidance here. The parties have not cited and the court has not found any other cases interpreting the language of Ind.Code § 9–21–8–24.

The court has followed the example of the Seventh Circuit in *Powell* and has turned to other resources to interpret the language. The Indiana Driver's Manual is published by the Indiana Bureau of Motor Vehicles and is part of the evidence in this case. See Ex. C. Under the section entitled "Basic Elements of Safe Vehicle Operation," the Manual states: "Staying within the driving lane you are traveling except to turn or pass is the first rule of traffic safety." Ex. C. at 34. The Manual further explains: "White lane markings are used to separate multiple lanes of traffic going in the same direction. . . . A broken white line authorizes a driver to change lanes when it is safe to do so . . . . (iv) Use your directional signals to alert other drivers you are about to change lanes." Ex. C at 34. The Manual plainly assumes that "lanes" are separated by painted markings. The Manual does not suggest or even hint that drivers must use turn signals when merging in the absence of lane markings.

Indianapolis Police Department officers often refer to another booklet, the "IPD Traffic Violation Phraseology Guide," when citing drivers for traffic violations. See Ex. B. This Guide assists officers by categorizing traffic violations by the type of violation, *e.g.,* turns, stopping and yielding. The Guide does not list failing to signal when merging as a traffic violation. In fact, nowhere in the Guide are merging violations discussed. Similarly, no provision of the Indiana Code expressly requires drivers to signal when they are merging from two lanes into one lane.

Although signaling before merging may be a safe driving practice, Indiana law does not require drivers—at the risk of a fine of $110—to signal their intention to merge in this situation, where there are no lines separating distinct traffic lanes. See Ex. 1 (noting fine of $110 for "failure to signal lane change"). The Indiana statute requiring drivers to signal before changing lanes does not suggest that the merging for westbound traffic on 21st Street amounted to a change of lanes. The only driving information available to Indiana drivers instructs them that lanes are defined by white lane markings. See Ex. C. at 34. Under Ind.Code § 9–21–8–24, a "lane change" cannot reasonably be interpreted to include a merge where a vehicle does not cross any white lane markings. Because Gold did not cross any white lane markings when he pulled in front of the pickup truck, he did not "change lanes" under Ind.Code § 9–21–8–24. Officer Feeney's reliance on Gold's failure to signal was therefore unjustified.

■ The government argues that even if Gold did not actually commit a traffic violation, Officer Feeney was justified in making the traffic stop because he had an objectively reasonable, good faith belief that Gold had committed a traffic violation. The government cites *United States v. Dexter*, 165 F.3d 1120, 1124 (7th Cir.1999), as an example of such an objectively reasonable, good faith belief for a traffic stop where there might not have been a violation in fact. In *Dexter* the officer was unable to see any license plate on the vehicle he stopped. In fact, the vehicle had a temporary tag displayed in the rear window, but the officer could not see it because the window was tinted so darkly. The Seventh Circuit upheld the validity of the stop, concluding that the state law requiring visible display of a registration plate applied to temporary tags, and that, in any event, the officer could reasonably rely on the statute in citing the violation. *Id.* at 1125.

The evidence here does not show the sort of understandable and reasonable mistake of fact that the Seventh Circuit found

acceptable in *Dexter.* Officer Feeney stopped Gold and issued a ticket for failing to signal a lane change where there were no lanes marked.

At the hearing in this case and in the briefs, the parties and the court have addressed hypothetical questions involving speeding violations. For example, if a police officer checks a car's speed with a radar gun which, unknown to the officer, is not working properly, the officer can reasonably rely on a radar reading to stop a car that is not actually breaking the speed limit. The government concedes, however, that if a car is going 55 miles per hour in a 55 miles per hour zone, an officer's mistaken belief that the local speed limit is 40 miles per hour will not justify a stop.

This case is more similar to the latter situation, where the officer was mistaken about what the law required in a given situation. The government simply has not identified reasonable grounds for Officer Feeney to believe Gold violated the law as the two lanes merged on 21st Street.

If courts do not insist on objectively reasonable grounds supporting a belief that a driver has violated the law, the police would have essentially unlimited discretion to subject drivers and passengers to the great intrusions on privacy that are constitutionally permissible with a valid traffic stop, especially after *Whren v. United States* and *Maryland v. Wilson.* Eight months after the Supreme Court's decision in *Whren,* Justice Kennedy observed: "The practical effect of our holding in *Whren,* of course, is to allow the police to stop vehicles in almost countless circumstances." *Maryland v. Wilson,* 519 U.S. 408, 423, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (Kennedy, J., dissenting). The only remaining legal barrier preventing police officers from being allowed to stop vehicles in *all* circumstances is the requirement that an officer have probable cause to believe the driver actually committed a traffic violation. That requirement was not satisfied here, and the evidence seized as a result of the stop must be suppressed.

## II. *The Order to Exit the Vehicle*

Although the lack of probable cause for the initial stop resolves Gold's motion to suppress, the court will also address Gold's additional challenges to Officer Feeney's actions while the evidence is still fresh. Gold argues that Officer Feeney did not have reasonable grounds for ordering him to step out of his car. The court disagrees. The Supreme Court held in *Pennsylvania v. Mimms* that an officer could order a driver to step out of his car for safety reasons during an otherwise lawful traffic stop. 434 U.S. at 110–11, 98 S.Ct. 330. Officer Feeney had sufficient safety reasons here to order Gold to step out of his car. Officer Feeney wanted to explain the tickets, especially the warning ticket, to Gold. Officer Feeney's usual practice is to ask a driver to step out of the car when he has to issue or explain a ticket because he is wary about reaching in through the passenger side window of a vehicle. Such safety concerns can be heightened when a traffic stop is conducted in a high crime area. Officer Feeney stopped Gold in an area known for violent crimes. Just a few weeks prior to this traffic stop, two individuals were found shot to death in a car near the intersection where Officer Feeney stopped Gold. Also, Officer Feeney had just seen Gold stop briefly at a house the police were surveilling for possible drug trafficking. Viewed in their totality, these circumstances made it reasonable for Officer Feeney to order Gold to step out of the car.

## III. *The Frisk*

Gold also argues that Officer Feeney did not have reasonable grounds for frisking him after he stepped out of the car. During an otherwise reasonable traffic stop, an officer may frisk a person's outer clothing to search for a weapon if the officer has a reasonable suspicion that the person is armed and dangerous to the officer or others. See *Pennsylvania v. Mimms,* 434 U.S. at 111–12, 98 S.Ct. 330; *Terry v. Ohio,* 392 U.S. at 23–27, 88 S.Ct.

1868 (upholding frisk for weapons as part of investigative stop where officer had reasonable grounds for believing suspects might be armed). The court concludes that Officer Feeney had reasonable and specific grounds for being concerned about his safety when Gold stepped out of his car. The most important reason was the "bunching" of Gold's shirt that Officer Feeney observed when Gold stepped out of the car.

In addition, Officer Feeney had observed Gold stop briefly at a house that had been the subject of complaints about possible drug trafficking. While police officers "do not have carte blanche to pat down anyone in a dangerous neighborhood," the criminal activity in the neighborhood is nevertheless one factor that an officer and a court can consider in evaluating the totality of the circumstances facing the officer in deciding to conduct a frisk. *United States v. Brown,* 188 F.3d 860, 865 (7th Cir.1999); accord, *United States v. Maher,* 145 F.3d 907, 909 (7th Cir.1998). When viewed in totality, the court finds that the area's extensive record of criminal activity, Officer Feeney's experience as a patrol officer in the area, Gold's suspicious activity, and the bulge in Gold's shirt all caused Officer Feeney reasonably to believe that his safety was in danger. His attempt to frisk Gold for weapons was not unreasonable.

### Conclusion

Gold's Fourth Amendment rights were violated when Officer Feeney pulled Gold over based on a mistaken and objectively unreasonable belief that Gold had committed a traffic violation. Because Gold was not required to signal when merging, Gold did not commit a traffic violation and the traffic stop was invalid. The court therefore GRANTS Gold's motion to suppress all evidence seized after the illegal traffic stop.

So ordered.